## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Keith Brown, being duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Boston, Massachusetts Field Office.  Since joining the FBI in 2014, I have been assigned to squads that investigate economic crimes, including various forms of corporate and securities fraud.  I received training at the FBI Academy, Quantico, Virginia, in a variety of investigative and legal matters, including Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.

2.      Pursuant to this affidavit and criminal complaint, I seek to charge JOSEPH A. PADILLA with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.l0b-5, and Title 18, United States Code, Section 2 (aiding and abetting).

3.      As described herein, I have probable cause to believe that PADILLA participated in a sophisticated and lucrative "pump and dump" securities fraud scheme involving the shares of Charlestowne Premium Beverages Inc. ("Charlestowne"), a thinly-traded microcap or "penny stock" company.  For the benefit of one or more persons who controlled the public float of Charletowne's stock, PADILLA fraudulently inflated the company's stock price and then facilitated the sale of the company's stock at pumped up prices to unsuspecting investors in Massachusetts and throughout the United States.

4.      Because this affidavit is being submitted for the limited purpose of demonstrating that there is probable cause to arrest PADILLA on the federal criminal charge set forth above, I have not included each and every fact known to me and to other law enforcement officers

involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested warrant.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses.

## RELEVANT ENTITIES, PRINCIPLES, AND DEFINITIONS

5.     The Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government responsible for enforcing the federal securities laws and promulgating rules and regulations thereunder.  Those laws, rules and regulations are, among other things, designed to protect the investing public by maintaining fair and honest securities markets and eliminating manipulative and deceptive trading practices.

6.     Transfer agents are companies that, among other activities, issue and cancel certificates of a company's stock to reflect changes in ownership, such as when stock is changing hands.  Many companies with publicly traded stock use transfer agents to track the ownership of their stock.

7.     Market makers are firms or individuals who stand ready to buy or to sell stocks at publicly quoted prices.  Market makers provide liquidity and depth to markets and generally profit from the difference in the spread between offers to buy and offers to sell stocks.

8.     Convertible notes are a form of debt that may be issued by a company and that may, under certain circumstances, be exchanged for a pre-determined number of shares of stock directly issued by the company.

9.     Microcap stocks, also known as "penny" stocks, are among the securities that are subject to the federal securities laws.  These stocks are, as a general matter, securities of publicly traded companies that have a low market capitalization and a low price per share (frequently,

though not always, $1 or less).  Microcap stocks are most often traded on the "over-the counter" market, rather than on national exchanges such as the New York Stock Exchange or the NASDAQ, and tend to be thinly traded.  Less information is typically available to the investing public about companies that issue microcap stock.  Often, a small number of individuals control large blocks of microcap stock, and by virtue of their control, such individuals can orchestrate manipulative trading in a microcap stock.

10.     Among the ways that federal securities laws and regulations aim to protect investors is by (i) mandating certain disclosures by holders of large quantities of stock registered with the SEC, and (ii) limiting the ability of executive officers, directors, and large shareholders to sell significant amounts of their stock quickly in the open market.

11.     For example, when a person or group of persons acquires beneficial ownership[1] of more than five (5) percent of a voting class of stock registered with the SEC, the person or group must file a Schedule 13D with the SEC disclosing such ownership and setting forth background information about the owner(s) and their investment intentions.  Based on my training and experience, I know that as part of their compliance programs, brokers often ask individuals seeking to deposit shares in microcap stocks whether they own or control more than five percent of the issuer's shares.

12.     Similarly, control securities—which are securities owned by a person who directly or indirectly controls the issuer, either alone or as a member of a control group—are subject to Rule 144 of the Securities Act of 1933 ("Rule 144") [17 CFR § 230.144].  Rule 144 uses the term "affiliate" to describe such a control person or group, and persons or groups

---

[1] A beneficial owner is any person who directly or indirectly has (or shares) voting or investment power, which includes the power to sell or direct the sale of a security.

holding more than 10 percent of a company's stock are generally deemed to be affiliates.  In the context of securities traded "over-the-counter"—such as most microcap stocks—Rule 144 provides that an affiliate cannot sell more than one percent of the issuer's total outstanding shares in any three-month period.  Rule 144 was enacted to "implement the fundamental purposes" of the Securities Act of 1933, namely to "provide full and fair disclosure of the character of the securities sold in interstate commerce … and to prevent fraud in the sale thereof."  37 Fed. Reg. at 596.  Based on my training and experience, I know that as part of their compliance programs, brokers often ask individuals seeking to deposit shares in microcap stocks whether they are an officer, director, 10 percent shareholder, or otherwise an affiliate of the issuer.

13.     Rule 144 also places certain restrictions on the selling of so-called "restricted" securities.  Such shares, which are acquired directly from issuers and are not registered with the SEC, generally cannot be sold to the public and bear a legend indicating that they are "restricted."  Shares that are registered with the SEC and that do not bear a legend indicating they are restricted are considered "unrestricted" or "free-trading," and such shares may be sold in the market by non-affiliates.  Rule 144 also identifies circumstances in which a shareholder holding restricted shares can have the legend removed, allowing the shares to become free-trading.  One such circumstance is if the shareholder is a non-affiliate and has held the shares for a certain period of time, typically either six months (if the company's shares are registered under Section 12) or one year (if the company's shares are not so registered).

14.     The total number of unrestricted securities deposited with brokers and available for trading is known as the "float."  For example, if hypothetical company Acme Corporation issued 10 million shares, but only one million were unrestricted and deposited with brokers (and

thus available to be traded), the "float" would be one million shares.  The remaining nine million shares might be a mix of restricted shares and unrestricted shares not yet deposited with any broker.  Like individuals who control greater than 10 percent of a company's total outstanding shares, individuals who control a majority of a company's float are also likely to be control persons and, therefore, affiliates for purposes of Rule 144.[2]

15.     I know from my training and experience that one form of fraud in the securities markets involves individuals (or groups of individuals) acquiring and exercising control over a significant portion of an issuer's shares, and often a majority of an issuer's float, while concealing their affiliate status.  In such a scheme, after acquiring a large portion of an issuer's free-trading shares, the individual or group will typically distribute those shares among accounts held in the names of "nominees"—including sham entities and other third parties—to help conceal their identities as the true owners of the stock.  In so doing, the perpetrators seek to avoid and circumvent the reporting requirements and restrictions in the securities laws discussed above, as well as the controls put in place by brokerages selling the stock.  The perpetrators then sell their shares via the nominees to the unsuspecting public in contravention of the securities laws.  The proceeds from such sales are often then funneled back to the perpetrators or to third parties at the perpetrators' direction.  This type of "concealed control" scheme occurs most frequently in the market for microcap stock.

16.     I know from training and experience that these concealed-control schemes are often accompanied and supported by stock manipulation in the form of "pump-and-dumps."  A "pump-and-dump" typically involves an effort to artificially inflate the stock price or trading

---

[2] *See Sec. & Exch. Comm'n v. Longfin Corp.*, 316 F. Supp. 3d 743, 759 (S.D.N.Y. 2018).

volume of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's float can sell their shares at artificially high prices, or in a more liquid market, to other investors (the "dump").  Typically, such schemes involve the use, among other means, of news releases, email blasts, and other forms of promotion—often containing false or exaggerated information—to inflate the stock price and trading volume and to generate demand for the shares.

## RELEVANT INDIVIDUALS & ENTITIES

17.     Defendant JOSEPH A. PADILLA, age 53, maintains residences in Carlsbad, California, and Cabo San Lucas, Mexico.  Prior to 2012, PADILLA was a registered representative at Scottsdale Capital Advisors LLC, a broker-dealer registered with the SEC.  In January 2012, a final judgment was entered by consent against PADILLA in connection with a civil enforcement action filed by the SEC.  The SEC's action alleged that, as part of a 2008 pump-and-dump scheme, Padilla facilitated the deposit of unregistered penny stock shares into a brokerage account that he controlled and sold the shares into the public market in contravention of the securities laws.  The SEC subsequently barred PADILLA from associating with any broker-dealer for a period of at least three years.

18.     Charlestowne was a South Carolina-based company that described itself as a "a beverage company that develops, produces, markets and distributes lifestyle beverages" that range "from spirits to energy drinks to organic hemp extract of CBD-infused beverages."  The company was incorporated in Nevada in 1996 under a different name.  During the relevant time period, it traded on the over-the-counter market under the ticker symbol "FPWM."  For the three months ending December 31, 2020, Charlestowne reported $8,180 in revenue and a net loss of $20,725.

19.     Cooperating Witness 1 ("CW-1") is the founder, owner, and chief executive of a purported asset management firm based in Switzerland.[3]  Between approximately 2013 and 2018, CW-1 managed the asset management firm on a day-to-day basis, including by generally placing all stock trades on behalf of the firm's clients.  The asset management firm provided a platform through which undisclosed control persons could secretly and quickly dump large quantities of microcap stock in circumvention of the registration and disclosure requirements of the federal securities laws.  CW-1 has met PADILLA, who CW-1 described as both a client of the asset management firm and a competitor.

20.     Cooperating Witness 2 ("CW-2") is a registered representative of a U.S.-based broker-dealer and has been so since approximately 1999.[4]  During the relevant time period, CW-2 acted primarily as a market-maker for securities traded on the over-the-counter market.  CW-2 has met PADILLA, who CW-2 described as unofficial client for whom CW-2 traded securities based on a relationship of trust.  CW-2 has known and worked with PADILLA for at least 15 years.

## THE SECURITIES FRAUD SCHEME

21.     Based on the evidence described below, there is probable cause to believe that, between approximately February and April 2021, PADILLA facilitated the sale of Charlestowne

---

[3] In 2020, CW-1 pleaded guilty to securities fraud offenses in the United States District Court for the District of Massachusetts in connection with his/her participation in pump-and-dump schemes involving an undisclosed control group.  S/he is cooperating with the government's investigation in the hope of obtaining leniency when s/he is sentenced.  Information provided by CW-1 for this and other investigations has been corroborated by, among other things, documents, emails, other electronic messages, and trading records.

[4] CW-2 is cooperating with the government's investigation.  Information provided by CW-2 for this investigation has been corroborated by, among other things, text messages, phone call recordings, and trading records.

securities as part of a pump-and-dump scheme involving the concealed-control by one or more persons of a large portion of Charlestowne stock – including nearly the entire float – that netted at least $7 million in illicit proceeds.

22.    More specifically, there is probable cause to believe that PADILLA orchestrated the fraudulent manipulation of Charlestowne stock in order to inflate its price through his association with five traders and CW-2 and that PADILLA orchestrated the dump of Charlestowne stock through Valor Capital, a broker-dealer in the Cayman Islands.  As discussed below, Valor Capital ultimately came to control almost 97 percent of the public float of Charlestowne's stock.

<em>Padilla's Association with Valor Capital</em>

23.    In an encrypted text message that I have reviewed, PADILLA associated himself with an entity referred to as "Valor."  The text message came from a communications network maintained in Curacao.  CW-1 has explained to agents, and records obtained by the government have confirmed, that British Columbia resident Frederick Sharp maintained this encrypted and closed communications network on a server in Curacao from approximately 2013 through 2015. Records from the network show that dozens of individuals involved in the sale of penny stocks in contravention of the securities laws used it to communicate.[5]  According to CW-1, Sharp provided co-conspirators with BlackBerry phones connected to the network so they could engage in secure communications.  CW-1 further explained that users referred to their BlackBerry phones as "xphones," and the messages themselves reflect that accounts on the system were

---

[5] In August 2021, based in part on communications found on the xphone network, Sharp and three co-defendants were charged with conspiracy to commit securities fraud and securities fraud in a criminal complaint for their participation in sophisticated and lucrative pump-and-dump scheme generating tens of millions of dollars in illicit proceeds.  *See United States v. Sharp et al.*, 21-mj-07182-JCB (Aug. 4, 2021).

identified either by account numbers or code names.  CW-1 identified PADILLA's account

number on the xphone network as account 78, and CW-1's business records identify one of user

78's codenames as "Sterling."  Per CW-1 and CW-1's business records, Sterling Securities

Group was the name used by National Advisors Corporation ("NAC"), a Panamanian broker that

was a client of CW-1's asset management firm.  CW-1 stated that PADILLA directed the trading

for NAC, d/b/a Sterling.  CW-1 also identified Financials Worldwide Inc., or FWW as a second

client for which PADILLA directed trading..  Publicly available records from Belize's

International Financial Services Commission show that FWW was a broker in Belize prior to

approximately January 1, 2019, when its license was not renewed.  Communications on the

xphone network that I have reviewed reflect that user "Sterling" – *i.e.*, PADILLA – messaged

Sharp in April 2015 that "[w]e are very close to being operational for valor and fww."

24.     A Toronto-based broker dealer discussed below, which maintains an account for

Valor, has stated that FWW (a one-time client of the broker) "changed their name to Valor

[Capital]" in or about 2019.  Corroborating this assertion, an email produced by the broker

further reflects that, in March 2020, a representative of Valor directed the broker to pay

outstanding FWW charges using Valor funds.

25.     CW-1 told agents that PADILLA used a "front man" for his client entities

("Individual 1"), including for NAC d/b/a Sterling.  CW-1's business records reflect that

Individual 1 was identified as the beneficial owner for NAC d/b/a Sterling.

26.     Individual 1 also had a relationship with Valor.  Specifically, records obtained

from Valor show that Individual 1 was a business consultant for Valor since January 2019 and

was tasked with introducing clients.  (Valor, however, told the Cayman Islands securities

regulator that it has "never heard of" nor conducted "any business relations" with PADILLA.)

*Control of Charlestowne's Float*

27.     Valor came to control the public float of Charlestowne's stock in the following manner.

28.     As background, Charlestowne's company filings with OTC Markets reflect that, as of December 31, 2020, the company had 40,463,303 shares outstanding.  Of those, 35 million were restricted shares issued to the company's CEO in September 2019.  The public float consisted of 5,157,593 free-trading shares.

29.     The company's filings and transfer agent records show that 5 million of the shares in the public float – equal to nearly 97 percent – were made up of two blocks of 2.5 million shares.  The first block was issued to the entity Wellesley Holdings Ltd. on or about December 18, 2019 (the "Wellesley Block"), and the second block was issued to the entity Porrima Ltd. on or about January 9, 2020 (the "Porrima Block").

30.     There is probable cause to believe that both the Wellesley and Porrima Blocks were issued based on fraud.  Transfer agent records that I have reviewed show that both blocks were issued based on a $100,000 convertible note purportedly issued on January 3, 2016 by Charlestowne's predecessor to the entity Ticino Capital LTD (the "Ticino Note").  In September 2019, Ticino Capital assigned $25,000 of the Ticino Note to each of Wellesley and Porrima purportedly in exchange for $25,000 from each.  Wellesley and Porrima in turn then each converted their portions of the Ticino Note into 2.5 million Charlestowne shares (comprising the Wellesley and Porrima Blocks, respectively).

31.     Bank statements that were provided to the transfer agent to support the authenticity of the Ticino Note and the assignments to Wellesley and Porrima appear to be fraudulent for the following reasons.  First, a bank statement from a U.S.-based bank for

Charlestowne's predecessor (1st Prestige Wealth Management) appears to have been altered to reflect a $100,000 incoming wire from Ticino Capital in January 2016. The transaction details for the wire on the statement are grossly misaligned on the page. Based on my training and experience, I believe that a genuine bank statement was edited to make it appear as if a $100,000 incoming wire had been received and that the statement is fraudulent. A screenshot of the supposed bank statement is provided below (redactions added):



32.     Second, bank statements from a Hungarian bank that the transfer agent received do not match genuine records obtained from the Hungarian bank obtained by the government. The records possessed by the transfer agent purport to reflect $25,000 wires from each of Wellesley and Porrima to Ticino Capital in September 2019.  The genuine transaction records from the Hungarian bank for the same accounts using the same account numbers do not include any such payments to Ticino, however.  In addition, I compared the genuine transaction history for Wellesley with the two purported bank statements for Wellesley and Porrima received by the transfer agent.  Based on my training and experience, I believe that a genuine Wellesley bank statement was modified to create the two fake Wellesley and Porrima bank statements.  Both of the bank statements, for example, list three transactions with the same transaction details, with the only change being the supposed dates.  In an apparent effort to conceal their identical nature, the supposed Porrima bank statement redacts the transaction amounts for the two non-Ticino transactions.  These fake bank statements lead me to believe, based on my training and experience, that the note assignments to Wellesley and Porrima were controlled by the same person(s), and that in turn the Wellesley and Porrima Blocks were controlled by the same person(s).  Screenshots of the transaction details from both bank statements are included below:

Supposed Wellesley bank statement (redactions in original):

| | Terhelés | Jóváírás | Egyenleg / Fedezet |
|---|---|---|---|
| NYITÓ EGYENLEG: | | | ███████ |
| HALMOZOTT TERHELÉS: | 25.048,03 | | |
| HALMOZOTT JÓVÁÍRÁS: | | | |
| ZÁRÓ EGYENLEG: | | | ███████ |
| FELHASZNÁLHATÓ ÖSSZEG: | | | ███████ |

### FOLYÓSZÁMLA FORGALMAK

| Értéknap | Tranzakció adatai | Terhelés | Jóváírás |
|---|---|---|---|
| 2019.09.20 | Tranzakciós díjrész Azonosító szám: 000FOEN192690144 | 19,63 | |
| 2019.09.20 | SWIFT átutalás terhelése Azonosító szám: 000FOEN192690144 Elektronikus csatorna: PCBIH Ellenszámlaszám: /1626270407 Ellenszámlaszám tulajdonosa: Ticino Capital Limited Megbízás összeg: 25000 USD | 25.000,00 | |
| 2019.09.20 | SWIFT átutalás (terhelés) jutaléka Tranzakció azonosító: 000FOEN192690144 | 28,40 | |
| Összesen: | | 25.048,03 | |

Supposed Porrima bank statement (redactions in original):

| | Terhelés | Jóváírás | Egyenleg / Fedezet |
|---|---|---|---|
| NYITÓ EGYENLEG: | ████████ | ████████ | ████████ |
| HALMOZOTT TERHELÉS: | | | |
| HALMOZOTT JÓVÁÍRÁS: | | | |
| ZÁRÓ EGYENLEG: | | | |
| FELHASZNÁLHATÓ ÖSSZEG: | | | ███████ |

### FOLYÓSZÁMLA FORGALMAK

| Értéknap | Tranzakció adatai | Terhelés | Jóváírás |
|---|---|---|---|
| 2019.09.27 | Tranzakciós díjrész Azonosító szám: 000FOEN192690144 | ████ | |
| 2019.09.27 | SWIFT átutalás terhelése Azonosító szám: 000FOEN192690144 Elektronikus csatorna: PCBIH Ellenszámlaszám: /1626270407 Ellenszámlaszám tulajdonosa: Ticino Capital Limited Megbízás összege: 25000 USD | 25.000,00 | |
| 2019.09.27 | SWIFT átutalás (terhelés) jutaléka Tranzakció azonosító: 000FOEN192690144 | ████ | |
| Összesen: | | ████ | |

33.     Both the Wellesley and Porrima Blocks were issued pursuant to opinion letters written by the same attorney, which opinion letters were also provided to the transfer agent.  The opinion letters expressed the attorney's view that Wellesley and Porrima were eligible to be issued free-trading shares without any restrictions because, among other reasons, the Ticino Note supposedly was fully paid as of January 2016 (thereby satisfying the requisite holding period) and Wellesley and Porrima each supposedly owned less than 10 percent of Charlestowne's issued and outstanding shares (and therefore each was not an affiliate).  In truth, for the reasons discussed above, there is probable cause to believe that the Ticino note was not in fact ever truly paid for and the same person(s) controlled both the Wellesley and Porrima Blocks.

34.     By about October 2020, nearly all of the shares in the Wellesley and Porrima Blocks were held in a single Valor account.  Transfer agent records reflect that the Porrima Block was immediately assigned to Valor Capital when the shares were issued.  And brokerage records reflect that the Wellesley Block was later transferred to Valor Capital in or about October 2020.  Specifically, brokerage records for a Toronto-based broker-dealer reflect that it held 2.5 million shares for Valor Capital beginning at least as of May 2020 (*i.e.*, the Porrima Block).  (Valor sold approximately 18,500 shares in May and June 2020.)  The records further reflect that Valor Capital's account received another 2,503,750 shares in October 2020, for a total balance of 4,985,250 shares.  This was equal to nearly all of the 5 million shares issued to Wellesley and Porrima.  And as of September 30, 2020, Charlestowne's public float remained (only) 5,157,593 shares, meaning that Valor Capital's account controlled nearly 97 percent of the float, as well as over 12 percent of the company's total outstanding shares (*i.e.*, over the 10 percent threshold generally considered to make an individual or group a control person).

*Manipulative Trading in Charlestowne Stock*

35.     At the beginning of 2021 – at which point in time Valor's account controlled

nearly all of Charlestowne's float and over 12% of its issued and outstanding shares – trading in

Charlestowne's stock was nearly non-existent.  Specifically, publicly available trading data

provides that, between January 4, 2021 and February 17, 2021, Charlestowne's stock traded only

on approximately 10 of 31 days.  On the days it had activity, the data shows that it averaged less

than 600 shares traded per day and fluctuated in price between $0.36 and $0.58 per share.

36.     There is probable cause to believe that, on February 18, 2021, PADILLA

orchestrated a concerted effort to artificially inflate the price of Charlestowne's stock as high as

$1.80 (an almost 500% increase over the prior day's closing price).  As discussed further below,

this effort involved trades placed in a brokerage account in PADILLA's name, trades placed in 5

additional brokerage accounts held in other individuals' names (together with PADILLA's

account, the "manipulative trading accounts"), and trades placed by CW-2 at PADILLA's

request.  The trades placed in the manipulative trading accounts and by CW-2 accounted for over

80% of the trading volume that day, which jumped to over 25,000 shares traded.  I reviewed

Charlestowne's public disclosures and found that the company issued no press releases that day,

and I have not identified any other news about the company publicized that day.  (The

company's then-most recent prior press release was several months earlier on July 29, 2020,

when the company announced that it had changed its name to Charlestowne.)

37.     Specifically, over the course of about two hours and approximately 20 trades, the

manipulative trading accounts bought thousands of FPWM shares at incrementally higher prices.

First, at approximately 12:49 pm, an account in the name of Trader 1 placed a limit order to buy

1,000 FPWM shares at $0.60 per share (nearly double the prior day's closing price of $0.36 per

share), which order was filled (i.e., successfully executed).  (A limit order is a type of order to purchase or sell a security at a specified price or better.)  Within the next four minutes, accounts in the names of Traders 1, 2, and 3 placed limit orders to buy 3,000, 5,000, and 2,000 FPWM shares, respectively, at $0.80 per share, each of which was filled.  Within the next two minutes, Trader 3's account placed a limit order to buy 1,000 shares at $0.84, which was only partially filled (9 shares), and then Trader 2's account placed a limit order to buy 2,000 FPWM shares at $0.85 per share, which was filled in full (at $0.84 per share).  And then over the next five minutes, leading up to 1:00 pm, an account in the name of Trader 4 placed a limit order to buy 2,500 FPWM shares at $1.00 per share, which was filled, and Trader 3's account placed a limit order to buy 2,500 FPWM shares also at $1.00 per share, which ultimately was not filled.  In total, over the course of approximately 11 minutes, these four accounts' purchases pushed Charlestowne's stock price up to $1.00, nearly triple the prior day's close of $0.36.

38.    Trades in a brokerage account in PADILLA's name then pushed the price even higher, to $1.80 per share.  Between approximately 1:44 and 1:49 pm, PADILLA's account placed limit orders to buy 1,000 FPWM shares at $1.30 per share and 1,200 FPWM shares at $1.80 per share; both orders were filled.  During this same period, Trader 3's account placed a limit order to buy 5,000 FPWM shares at $1.30 per share, which was not filled, and an account in the name of Trader 5 placed a limit order to buy 2,250 FPWM shares at $1.80 per share.  When Trader 5's order was not immediately filled, Trader 5's account cancelled and then re-placed the same order, which order was filled soon thereafter.

39.    Trading records also show that CW-2 purchased FPWM shares at inflated prices on February 18, 2021, which CW-2 told agents s/he would have done only at PADILLA's request.  Specifically, trading records show that, between approximately 1:00 and 1:20 pm on

February 18, 2021 (*i.e.*, the period immediately after Traders 1-4 pushed the price up to a $1.00

but before PADILLA entered buy orders at $1.30 and $1.80), CW-2 placed one or more orders to

buy a total of 800 FPWM shares that executed at prices between $1.30 and $1.80.  CW-2 has

explained that s/he placed the buy orders not because s/he had a rational economic basis for the

purchases (i.e., s/he did not place the orders for investment reasons), but rather only because

PADILLA had asked CW-2 to do so.  CW-2 explained that he hoped and anticipated, based on

past experience, that PADILLA would later facilitate large sales of FPWM shares and that CW-2

would benefit from such sales.  As discussed further below, that is precisely what later occurred.

*Padilla's Connections to Traders 1-5*

40.     Brokerage accounts in the names of PADILLA and Traders 1, 2, and 4 have all

logged in numerous times from IP addresses assigned to PADILLA's internet account at his

residence in Carlsbad, California.  (IP addresses are network addresses for devices connected to

the internet.)  Based on my training and experience, I therefore believe that each account has

logged in numerous times from PADILLA's California residence.  In addition, subscriber

records for the internet service identify a user email address in the name of Trader 1, whose first

name has been identified by CW-2 as the name of PADILLA's girlfriend.

41.     On February 18, 2021 (the day of the manipulative trading described above),

PADILLA's brokerage account and Trader 3's brokerage account logged in from the same IP

address (*i.e.*, from the same location).  CW-2 has stated that PADILLA also has a Russian

girlfriend, and, based on my experience, Trader 3's name is one that is consistent with Eastern

European descent.

42.     According to public court filings, Trader 4 was the spouse of another individual

("Individual 2") who also has extensive connections to PADILLA and whom I have probable

cause to believe regularly works with PADILLA.  (Trader 4 filed for divorce from Individual 2 in June 2021.)  Like Trader 4's brokerage account, Individual 2's brokerage account has logged in numerous times from an IP address associated with PADILLA's California residence.  (Trader 4's and Individual 2's accounts have themselves also logged in from the same IP address hundreds of times, albeit a different IP address than the one associated with PADILLA's California residence.)  In addition, telephone call records for accounts in Individual 2's and PADILLA's names reflect periodic and regular phone contact between them from at least March 2019 through December 2021.  Similarly, telephone call records reflect numerous contacts between Individual 2's account and CW-2's account in March and April 2022.  CW-2 has identified an individual using a shortened form of Individual 2's name as PADILLA's "Number 2."  CW-2 told agents that Individual 2 sometimes provided trading instructions on PADILLA's behalf when PADILLA was unavailable.  Such instructions were usually provided using an encrypted messaging platform that does not have a connection to any phone number, but CW-2 stated that at times CW-2 texted with Individual 2 via ordinary text messages.  CW-2 provided the phone number associated with PADILLA's "Number 2," which is Individual 2's phone number, based on phone records that I have reviewed.  Finally, CW-2 provided a picture of CW-2 with PADILLA's "Number 2."  I have compared the likeness of that individual to the likeness of an individual reflected in pictures on a Facebook account in Individual 2's name, and they appear to be the same person.  (A Facebook account in Trader 4's name is also tagged in pictures published on the Facebook account in Individual 2's name.)

43.    Telephone call records also reflect numerous contacts between PADILLA's phone number and phone numbers associated with Trader 2 between at least April 2019 and January 2022.  Telephone call records similarly reflect numerous contacts in January and

February 2022 between the phone number for Trader 1 (*i.e.*, PADILLA's U.S.-based girlfriend) and a phone number associated with Trader 2.

44.     Finally, a recorded call and trading records indicate that Trader 5 was part of PADILLA's group.  During a recorded call I have reviewed between PADILLA and CW-2 on April 26, 2022, CW-2 noted that market activity in the stock of another company ("Company 2") reflected bids (*i.e.*, offers to buy) at or above $0.70 per share before the close of trading.  In response, PADILLA stated, "That was us trying to get it to close above $0.70."  Trading records for Trader 5's account reflect that, at 3:37 pm on April 25, 2022 (*i.e.*, the day before), Trader 5's account placed a limit order to buy 111 shares of Company 2's stock at $0.85 per share, which was filled at $0.84 per share.  Company 2's share price closed that day at $0.84 (i.e., the same price), up 300% from the prior closing price of $0.28, with only 1,519 shares traded that day.

*Dump of Valor's Charlestowne Shares During Promotional Campaign*

45.     PADILLA's price manipulation shortly preceded a dump of millions of Charlestowne shares held by Valor (which controlled nearly 97% of Charlestowne's float) for millions of dollars in illicit proceeds.  The sales were facilitated to a significant degree by CW-2, whose role as a market maker provided PADILLA an efficient method to sell large quantities of shares quickly.

46.     As reflected in records that I have reviewed, between February 25, 2021 and late April 2021, CW-2 sold approximately 1.28 million FPWM shares, averaging tens of thousands of shares sold per day.  Trading records reflect that CW-2 nearly always sold FPWM shares short and then later bought FPWM shares to cover the short sales.  (A short sale occurs when an individual sells stock they do not own.  Individuals can make money by selling short if they are able to later buy the stock at a lower price.)  CW-2 has explained that CW-2 sold FPWM shares

short at PADILLA's request and direction based on CW-2's anticipation, in light of his past experience with PADILLA, that PADILLA would later facilitate a sale of FPWM shares to CW-2 to cover CW-2's short sales.  CW-2 and PADILLA discussed the price at which those shares would be sold to CW-2, which would generally be a slightly lower price than the price at which CW-2 sold FPWM shares short in the market (thereby providing CW-2 a modest profit margin).  Using this method, PADILLA was able to use CW-2 to make many small sales during a trading day (*i.e.*, do the work of selling shares in smaller transactions) and then obtain the benefit of those sales by later arranging a large sale order to CW-2 (who needed to cover his/her short sales) at a slightly inferior average price.

47.      Trading records also show that, during the same period that CW-2 was selling FPWM shares short at PADILLA's request and direction, over 2.3 million FPWM shares were sold from Valor's holdings at the Toronto-based broker, generating over $7.9 million in illicit proceeds.  The sales were effectuated through yet another broker.  Specifically, trading records reflect that a U.K.-based broker, through its U.S.-based clearing firm, sold the FPWM shares and then received the shares from Valor's account for purposes of settlement.  A review of the account statements for Valor's account and the account through which the shares were sold reflects an exact one-for-one relationship (*i.e.*, for every share sold, a share was transferred from Valor's account).

48.      A review of the number of shares purchased by CW-2 (to cover CW-2's short sales) and the amount of shares sold for Valor's account corroborate CW-2's description of selling shares short for PADILLA's benefit.  For example, on February 25, 2021 (the first day CW-2 began selling shares short), CW-2 purchased 28,000 shares to cover the short sales, the exact same amount sold for Valor that day (in other words, a 100% overlap).  Other similarly

high overlaps – each over 90 percent -- took place on March 1 (CW-2 purchased over 83,000 shares), March 3 (CW-2 purchased over 37,000 shares), March 10 (CW-2 purchased nearly 30,000 shares), March 24 (CW-2 purchased nearly 8,000 shares), March 25 (CW-2 purchased over 16,000 shares), March 26 (CW-2 purchased over 46,000 shares), and April 5, 2021 (CW-2 purchased over 230,000 shares).

49.     The sale of FPWM shares for Valor's benefit also took place during a promotional campaign, during which the price for FPWM shares rose significantly, closing as $8.00 on April 1, 2021.  Promotional materials captured by OTC Markets reflect, for example, a promotional email sent by pennystockbargain.com on March 1, 2021 touting FPWM as a "golden opportunity."  The email's subject line provided that FPWM was a "Momentum Stock … set to Continue its Vertical Rise" and the body of the email stated that FPWM was "primed to rocket 1000-1500% in the very short term."  Similar promotional emails were sent by pennystockbargains.com as March continued.  For example, on March 3rd, a promotional email stated that "we expect [FPWM] to hit $4 by close of trading Friday" and "we also expect it to continue its rise to $10 within no more than 1-2 months."  And on March 15th, a promotional email stated "that "[o]ur calculations tell us that FPWM shares will rise to between $4.90 and $5.00 today, … before hitting $6 to $7 by the end of the week."  Similarly, beginning on or about March 24th, a website titled "The Financial News" (at url www.the-financialnews.com) published an article about FPWM titled "Here's Why This Stock Is Poised To Jump Over 700%."  (Publicly available internet archives reflect that the article was available online at least as early as March 24th.  OTC Markets also captured the article on or about April 16th.)  Among the statements in the article was the claim that "Charlestowne's PAPA VODKA is taking America by storm.  The product continues selling out every time the company puts it on the

shelves." In May 2021, staff from the Financial Industry Regulatory Authority (FINRA) asked Charlestowne's CEO about this claim, which the CEO described as "absolutely horse [expletive]."

50. I have not to date identified the person(s) responsible for the promotional campaign, but based on my training and experience, I believe that it is consistent with pump-and-dump schemes which often involve both manipulative trading and deceptive or false messaging. The promotional messaging regarding Charlestowne's business served the purpose of generating interest and demand for the stock and is consistent with the subsequent run up in price.

51. Massachusetts residents purchased shares of FPWM after PADILLA's price manipulation and during the period of sales for Valor's account. For example, on or about March 1, 2021, Victim 1 purchased approximately 110 shares of FPWM after researching the stock. Victim 1 has stated that the FPWM's past price performance – which as of March 1, 2021 included the price increase on February 18, 2021 – was a factor in his decision to purchase the shares. Similarly, on or about March 4, 2021, Victim 2 purchased approximately 1000 shares of FPWM after learning about the stock through research. Victim 2 similarly stated that FPWM's price history almost certainly influenced his decision to buy the stock.

## CONCLUSION

52.     Based on my knowledge, training, and experience and the facts set forth in this affidavit, I have probable cause to believe and I do believe that PADILLA, committed securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.l0b-5, and Title 18, United States Code, Section 2.

Respectfully submitted,

/s/ Keith Brown

_____
Keith Brown
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to telephonically in accordance
with Fed. R. Crim. P. 41(d)(3) on this __ day of August 2022.

August 25, 2022

_____
Honorable M. Page Kelley
United States Chief Magistrate Judge
District of Massachusetts