UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | )  Criminal No.   23cr10075 |
| | ) |
| v. | )  Violations: |
| | ) |
| JOSEPH A. PADILLA and | )  <u>Count One</u>: Conspiracy to Commit |
| KEVIN C. DILLS, | )  Securities Fraud |
| | )  (18 U.S.C. § 371) |
| Defendants | ) |
| | )  <u>Counts Two & Three</u>: Securities Fraud |
| | )  (15 U.S.C. §§ 78j(b) and 78ff(a); 17 |
| | )  C.F.R. § 240.10b-5; 18 U.S.C. § 2) |
| | ) |
| | )  <u>Count Four</u>: Attempt to Cause the |
| | )  Production of an Identification |
| | )  Document Without Lawful Authority |
| | )  (18 U.S.C. §§ 1028(a)(1), (b)(2)(A), |
| | )  and (f); 18 U.S.C. § 2(b)) |
| | ) |
| | )  <u>Forfeiture Allegation</u>: |
| | )  (18 U.S.C. § 981 and 28 U.S.C. |
| | )  § 2461) |
| | ) |
| | )  <u>Forfeiture Allegation</u>: |
| | )  (18 U.S.C. § 982(a)(2)(B) & 18 U.S.C. |
| | )  § 1028(b)) |
| | ) |

<u>INDICTMENT</u>

At all times relevant to this Indictment:

<u>General Allegations</u>

<u>Key Persons and Entities</u>

1.     Defendant JOSEPH A. PADILLA was a part-time resident of Carlsbad, California and of Cabo San Lucas, Mexico.  Prior to 2012, PADILLA was a registered representative of a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC").  In January

2012, a final judgment was entered by consent against PADILLA in connection with a civil enforcement action filed by the SEC. The SEC subsequently barred PADILLA from associating with any broker-dealer for a period of at least three years.

2.      Defendant KEVIN C. DILLS was a resident of Carlsbad, California. DILLS controlled two Wyoming companies—Bright Star International, Inc. ("Bright Star") and Life Sciences Journeys, Inc. ("Life Sciences")—that owned convertible debt in the company Oncology Pharma, Inc. During the relevant period, nearly all of Oncology Pharma's funding came from DILLS via Bright Star and Life Sciences, and DILLS exercised effective control over Oncology Pharma's management despite holding no formal role with the company. In August 2001, an Administrative Law Judge at the SEC found that DILLS, who then owned a broker-dealer, had violated the antifraud provisions of the federal securities laws and barred DILLS from association with any broker or dealer.

3.      Oncology Pharma, Inc. ("Oncology Pharma") was a Nevada corporation based in San Francisco that described itself as involved in the "licensing, development, manufacturing, and commercialization of therapeutic drugs and medical devices" designed "for treatment of many types of cancers." The company was incorporated in or about 1993 under the name Parkway Capital Corporation. During the relevant time period, the company traded on the over-the-counter market under the ticker symbol "ONPH." For its fiscal year ending March 31, 2021, the company's unaudited annual report disclosed no revenues and a net loss of over $97 million. The company further disclosed that its financial condition "raise[d] substantial doubt" about its ability "to continue as a going concern."

4.     Charlestowne Premium Beverages, Inc. ("Charlestowne") was a Nevada corporation based in South Carolina that described itself as a "a beverage company that develops, produces, markets and distributes lifestyle beverages" ranging "from spirits to energy drinks to organic hemp extract of CBD-infused beverages." The company was incorporated in Nevada in 1996 under the name Zeppelin Production Corporation, Inc. During the relevant time period, it traded on the over-the-counter securities market under the ticker symbol "FPWM." In its 2020 annual report, Charlestowne reported $8,180 in revenue and a net loss of $20,725 for the three months ending December 31, 2020.

5.     Valor Capital was a broker-dealer located in the Cayman Islands and established in or about 2019. PADILLA had a close, unofficial association with Valor Capital since its inception and had effective control over its accounts holding shares of Charlestowne and Oncology Pharma.

6.     Individual 1 was a girlfriend of PADILLA's who resided in the United States and held a retail brokerage account.

7.     Individual 2 was PADILLA's cousin and held a retail brokerage account. Individual 2 granted PADILLA access to and authority over the brokerage account.

8.     Individual 3 was an individual who held a retail brokerage account as well as an account at Valor Capital. Individual 3 acted as a nominee for PADILLA.

9.     Individual 4 was the former spouse of a close associate of PADILLA's and held a retail brokerage account. PADILLA's close associate traded in Individual 4's retail brokerage account.

10.     Individual 5 was a girlfriend of PADILLA's who resided in Russia and held an account at Valor Capital. Individual 5 acted as a nominee for PADILLA.

3

11.     Individual 6 was an individual who assisted with the management of PADILLA's houses in Mexico and held an account at Valor Capital.  Individual 6 acted as a nominee for PADILLA.

12.     Individual 7 was an individual who held an account at Valor Capital.  Individual 7 acted as a nominee for PADILLA.

13.     Market Marker 1 was a registered representative of a U.S.-based broker-dealer and acted primarily as a market-maker for securities traded on the over-the-counter market.  Market Maker 1 traded securities at PADILLA's direction.

14.     Individual 8 was a resident of the United States and knew PADILLA.

Relevant Entities, Principles, and Definitions

15.     The Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government responsible for enforcing the federal securities laws and promulgating rules and regulations thereunder.  Those laws, rules and regulations are, among other things, designed to protect the investing public by maintaining fair and honest securities markets and eliminating manipulative and deceptive trading practices.

16.     Transfer agents are companies that, among other activities, issue and cancel certificates of a company's stock to reflect changes in ownership, such as when stock is changing hands.  Many companies with publicly traded stock use transfer agents to track the ownership of their stock.

17.     Market makers are firms or individuals who stand ready to buy or to sell stocks at publicly quoted prices.  Market makers provide liquidity to markets and generally profit from the difference in the spread between offers to buy and offers to sell stocks.

18.     Convertible notes are a form of debt that may be issued by a company and that may, under certain circumstances, be exchanged for a pre-determined number of shares of stock issued by the company.

19.     Microcap stocks, also known as "penny" stocks, are among the securities that are subject to the federal securities laws.  These stocks are, as a general matter, securities of publicly traded companies that have a low market capitalization and a low price per share (frequently, though not always, $1 or less).  Microcap stocks are most often traded on the "over-the counter" securities market, rather than on national exchanges such as the New York Stock Exchange or the NASDAQ Stock Market, and tend to be thinly traded.  In addition, companies that issue microcap stock typically make less information available to the investing public about their operations and financial performance.  Often, a small number of individuals control large blocks of microcap stock, and by virtue of their control, such individuals can orchestrate manipulative trading in a microcap stock.

20.     Among the ways that federal securities laws and regulations aim to protect investors is by limiting the ability of executive officers, directors, and large shareholders to sell significant amounts of their stock quickly in the open market.

21.     Control securities—which are securities owned by a person who directly or indirectly controls the issuer, either alone or as a member of a control group—are subject to Rule 144 of the Securities Act of 1933 ("Rule 144") [17 C.F.R. § 230.144].  Rule 144 uses the term "affiliate" to describe such a control person or group, and persons or groups holding more than 10 percent of a company's stock are generally deemed to be affiliates.  In the context of securities traded "over-the-counter"—such as most microcap stocks—Rule 144 provides that an affiliate

cannot sell more than one percent of the issuer's total outstanding shares in any three-month period. Rule 144 was enacted to "implement the fundamental purposes" of the Securities Act of 1933, namely to "provide full and fair disclosure of the character of the securities sold in interstate commerce … and to prevent fraud in the sale thereof." 37 Fed. Reg. at 596.

22.     Rule 144 also places certain restrictions on the selling of so-called "restricted" securities.  Such shares, which are acquired directly from issuers and are not registered with the SEC, generally cannot be sold to the public and bear a legend indicating that they are "restricted." Shares that are registered with the SEC and that do not bear a legend indicating they are restricted are considered "unrestricted" or "free-trading," and such shares may be sold in the market by non-affiliates.  Rule 144 also identifies circumstances in which a shareholder holding restricted shares can have the legend removed, allowing the shares to become free-trading.  One such circumstance is if the shareholder is a non-affiliate and has held the shares for a certain period of time, typically either six months (if the company's shares are registered under Section 12) or one year (if the company's shares are not so registered).

23.     The total number of unrestricted securities deposited with brokers and available for trading is known as the "float."  For example, if hypothetical company Acme Corporation issued 10 million shares, but only one million were unrestricted and deposited with brokers (and thus available to be traded), the "float" would be one million shares.  The remaining nine million shares might be a mix of restricted shares and unrestricted shares not yet deposited with any broker.  Like individuals who control greater than 10 percent of a company's total outstanding shares, individuals who control a majority of a company's float are also likely to be control persons and, therefore, affiliates for purposes of Rule 144.

24.     One form of fraud that occurs frequently in the market for microcap stocks is a "concealed control" scheme.   Such a scheme typically involves individuals (or groups of individuals) acquiring and exercising control over a significant portion of an issuer's shares, and often a majority of an issuer's float, while concealing their affiliate status.  After acquiring a large portion of the issuer's free-trading shares, the individual or group will typically distribute those shares among accounts held in the names of "nominees"—including sham entities and other third parties—to help conceal their identities as the true owners of the stock.   In so doing, the perpetrators seek to avoid and circumvent the restrictions in the securities laws discussed above, as well as the controls put in place by brokerages selling the stock.  The perpetrators then sell their shares via the nominees to the unsuspecting public in contravention of the securities laws.  The proceeds from such sales are often then funneled back to the perpetrators or to third parties at the perpetrators' direction.

25.     Concealed-control schemes are often accompanied and supported by stock manipulation in the form of "pump-and-dumps."  A "pump-and-dump" typically involves an effort to artificially inflate the stock price or trading volume of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's float can sell their shares at artificially high prices, or in a more liquid market, to other investors (the "dump").  Typically, such schemes involve the use, among other means, of news releases, email blasts, and other forms of promotion—often containing false or exaggerated information—to inflate the stock price and trading volume and to generate demand for the shares.   Such schemes can also involve manipulative trading designed to artificially inflate the stock price and generate the appearance of demand for the stock.

Overview of the Conspiracy and the Scheme to Defraud

26.    As set forth below, between 2020 and 2022, PADILLA conspired with DILLS and others known and unknown to the Grand Jury to commit securities fraud by facilitating and participating in pump-and-dumps involving the concealed-control of the stock of multiple penny-stock companies, including Oncology Pharma, Inc. and Charlestowne Premium Beverages, Inc. As part of the schemes, PADILLA "pumped" the companies' stock prices by orchestrating manipulative trading across numerous brokerage accounts—including his own account, and those of Individuals 1-4 and Market Marker 1—that artificially inflated the stocks' value. PADILLA thereafter "dumped" shares of those stocks through sales coordinated across multiple Valor Capital accounts held in the names of nominees—including Individuals 3 and 5-7—as well as through Market Maker 1, thereby obscuring the fact that the stock was under common control.

27.    Specifically, between approximately October 2020 and July 2022, PADILLA, DILLS, and others known and unknown to the Grand Jury generated more than $150 million in illicit proceeds by pumping and dumping shares of Oncology Pharma.  As part of the scheme, DILLS caused Bright Star and Life Sciences to exchange convertible debt of Oncology Pharma for free-trading shares in contravention of the securities laws concerning affiliates, which shares he then transferred to nominees controlled by PADILLA.  To "pump" the shares, PADILLA then orchestrated manipulative trading that inflated the value of its Oncology Pharma's stock while DILLS caused Oncology Pharma to issue press releases touting the company.  With Oncology Pharma's share price thus inflated, PADILLA caused entities including Valor Capital—which controlled as much as approximately 89 percent of the stock's public float and nearly 12 percent of its issued and outstanding shares—to dump their shares.

28.    Likewise, between February and April 2021, PADILLA and others known and unknown to the Grand Jury generated more than $7 million in illicit proceeds through the pump and dump of Charlestowne stock.    PADILLA orchestrated the fraudulent manipulation of Charlestowne stock to inflate its price and then caused the fraudulent dump of Charlestowne stock by Valor Capital, which controlled nearly 97 percent of the company's public float and more than 12 percent of its issued and outstanding shares.

<u>Object and Purpose of the Conspiracy and the Scheme to Defraud</u>

29.    The principal object of the conspiracy and the scheme to defraud was to commit securities fraud, in violation of Title 15, United States Code, Section 78j(b) and 78ff(a), and attendant regulations.    The principal purpose of the conspiracy and the scheme to defraud was for the defendants and their co-conspirators to make money by selling large quantities of penny-stock companies' shares in more liquid markets and at artificially inflated prices, while concealing their identities and actions from investors, regulators, and law enforcement.

<u>Manner and Means of the Conspiracy</u>

30.    Among the manner and means by which the defendants and others known and unknown to the Grand Jury carried out the conspiracy and the scheme to defraud were the following:

    a.    Acquiring and distributing free-trading shares of penny stock companies among multiple entities and nominees to disguise the fact that the shares were controlled by control persons acting alone or as part of a group;

    b.    Depositing the shares held under common control via Valor Capital in the names of nominees;

c.  Concealing from transfer agents and the investing public that the shares held by the nominees and deposited via Valor Capital were secretly controlled by the control persons;

d.  Engaging in coordinated manipulative trading using multiple brokerage accounts to artificially inflate the securities' share prices and trading volume;

e.  Engaging in promotional campaigns in Massachusetts and elsewhere to artificially inflate the securities' share prices and trading volumes;

f.  Selling the shares held under common control via Valor Capital during the promotional campaigns, in contravention of federal securities laws and regulations governing the sale of stock by affiliates;

g.  Using Market Maker 1 to facilitate the sale of shares held via Valor Capital;

h.  Distributing the proceeds of the stock sales for the benefit of the control persons; and

i.  Using encrypted and ephemeral messaging systems to conceal their actions from regulators and law enforcement, among others.

<u>Overt Acts in Furtherance of the Conspiracy and the Scheme to Defraud</u>

*Control of Oncology Pharma's Float & Deposit with Valor Capital*

31.  In or about January 2021, DILLS, PADILLA, and others known and unknown to the Grand Jury caused three million free-trading ONPH shares—representing the vast majority of Oncology Pharma's public float and nearly 12 percent of its issued and outstanding shares—to be transferred to Valor Capital.  The steps involved in the transfer included:

a. In or about October 2020, DILLS caused two blocks of free-trading shares to be issued by exchanging convertible notes issued by Oncology Pharma's predecessor years earlier.  The blocks included a block of two million shares issued to Bright Star and a block of one million shares issued to Life Sciences.

b. DILLS concealed his control of the one million shares issued to Life Sciences by having his girlfriend act as the President of Life Sciences at the time.  But because both Bright Star and Life Sciences were under DILLS' common control, and because DILLS also had effective control of Oncology Pharma, the three million shares were ineligible for free-trading status under applicable regulations.

c. In or about November and December 2020, DILLS caused the two blocks of free-trading shares to be transferred to two of PADILLA's nominees—Individuals 5 and 7, respectively—who, in turn, caused the shares to be transferred to Valor Capital in or about January 2021.

*Manipulative Trading in Oncology Pharma Stock*

32.     On or about January 19, 2021, at nearly the same time Valor Capital came to control nearly all of Oncology Pharma's public float, PADILLA sought to artificially inflate Oncology Pharma's stock price by orchestrating successive buy orders for thousands of ONPH shares at escalating prices.

33.     Over the course of approximately four hours on January 19, 2021, PADILLA and others known and unknown to the Grand Jury caused accounts in the names of Individuals 2 to 4 to place multiple limit orders to buy thousands of ONPH shares at prices between $0.60 and $1.00

per share, nearly all of which were filled.  (A limit order is a type of order to purchase or sell a security at a specified price or better.)  Prior to January 19, 2021, trading in Oncology Pharma's stock was minimal:  since December 1, 2020, on the days it had activity, it averaged less than 1,500 shares traded per day and its average closing price was approximately $0.50 per share.  Due in significant part to the manipulative trading, ONPH's share price ultimately closed that day at $1.09, on significantly higher volume.

*Dump of Valor Capital's Oncology Pharma Shares*

34.    Following the artificial inflation of Oncology Pharma's stock price, PADILLA caused Valor Capital to dump of millions of Oncology Pharma shares held under common control in the accounts of nominees, generating tens of millions of dollars in illicit proceeds.

35.    PADILLA used Market Maker 1 to facilitate a significant portion of the fraudulent stock sales as follows:

    a.  At PADILLA's direction, Market Maker 1 sold at least 8.6 million ONPH shares between January 21, 2021 and late July 2022, averaging tens of thousands of shares sold per trading day.  Market Maker 1 typically executed the sales by selling ONPH shares short.  (A short sale occurs when an individual sells stock they do not own.)

    b.  PADILLA then caused Valor Capital to sell ONPH shares to Market Maker 1 to cover Market Maker 1's short sales at prices that allowed Market Maker 1 to earn a profit on the trades.  Using this method, PADILLA was able to cause Market Maker 1 to execute many small sales during a trading day and then

obtain the benefit of those sales by arranging a large sale of shares to Market Maker 1 (to cover the short sales).

c.  During the period that Market Maker 1 was selling ONPH shares short at PADILLA's direction, PADILLA caused Valor Capital to sell approximately nine million ONPH shares, generating over $150 million in illicit proceeds. Massachusetts residents purchased shares of ONPH shortly after PADILLA's price manipulation and during the period in which Valor Capital was dumping ONPH shares.

d.  As with the first tranche of three million shares, the additional ONPH shares sold by Valor Capital primarily came from DILLS via Bright Star and Life Sciences, which obtained the shares from Oncology Pharma pursuant to convertible notes.

e.  DILLS, PADILLA, and others known and unknown to the Grand Jury caused the additional ONPH shares to be transferred to one or more of Individuals 3, 5, 6, and 7 before being transferred to Valor Capital.

f.  To compensate DILLS for the shares, PADILLA caused more than $19 million in proceeds from the stock sales to be sent to Bright Star and Life Sciences.

36.    During this same period—between January 2021 and July 2022—DILLS used his effective control over Oncology Pharma to induce the company to issue regular press releases touting the company.  The press releases were published online, including to prospective investors in Massachusetts.  The price of ONPH shares rose significantly during this period, closing as high as $43.80 on February 26, 2021, before crashing back down to below $1.00 by September 2022.

*Control of Charlestowne's Float & Deposit with Valor Capital*

37.     Between January and October 2020, one or more co-conspirators caused approximately five million free-trading FWPM shares—which were held by two nominee entities but under undisclosed common control—to be transferred to Valor Capital. The shares represented the vast majority of Charlestowne's public float and more than 12 percent of its issued and outstanding shares.

*Manipulative Trading in Charlestowne Stock*

38.     On or about February 18, 2021—after Valor Capital came to control nearly all of Charlestowne's public float—PADILLA sought to artificially inflate Charlestowne's stock price by orchestrating successive buy orders for thousands of FPWM shares at escalating prices, as set forth below.  Through this trading, PADILLA and others known and unknown to the Grand Jury caused FPWM's stock price to reach $1.80 over the course of about two hours on February 18, 2021, representing an almost 500 percent increase over the prior day's closing price.  By comparison, in early 2021, trading in Charlestowne's stock was nearly non-existent: on the days it had activity, it averaged less than 600 shares traded per day and fluctuated in price between $0.36 and $0.58 per share.

> a.  First, between approximately 12:49 pm and 1:00 pm, PADILLA and others known and unknown to the Grand Jury caused accounts in the names of Individuals 1 through 4 to place multiple limit orders to buy FPWM shares at prices starting at $0.60 and ending at $1.00.  The orders sought between 1,000 and 5,000 shares each, and the majority of the orders were filled (*i.e.*, successfully executed).

b.  Between approximately 1:44 and 1:49 pm, PADILLA pushed the price even higher by placing limit orders in his own brokerage account to buy 1,000 FPWM shares at $1.30 per share and 1,200 FPWM shares at $1.80 per share. Both orders were filled.

c.  At PADILLA's request, Market Maker 1 also purchased FPWM shares at inflated prices that day. Specifically, between approximately 1:00 and 1:20 pm, Market Maker 1 placed one or more orders to buy a total of 800 FPWM shares that executed at prices between $1.30 and $1.80. Market Maker 1 did not place the orders for bona fide investment or market-making reasons, but rather only because PADILLA had asked Market Maker 1 to do so.

*Dump of Valor Capital's Charlestowne Shares*

39.  Following the artificial inflation of Charlestowne's stock price, PADILLA caused Valor Capital to dump millions of Charlestowne shares held under common control in the accounts of nominees, generating millions of dollars in illicit proceeds.

40.  PADILLA orchestrated the sale of FPWM shares during a promotional campaign that further boosted the price and trading volume of FPWM shares, which closes as high as $8.00 on April 1, 2021, before crashing down to below $1.00 by late May. The promotional campaign included emails touting FPWM as a "golden opportunity" and "primed to rocket 1000-1500 percent in the very short term." The campaign also included an article on a purported financial news website touting FPWM, including with the false claim that "Charlestowne's PAPA VODKA is taking America by storm. The product continues selling out every time the company puts it on the shelves."

15

41.     PADILLA again used Market Maker 1 to facilitate a significant portion of the fraudulent stock sales, as follows:

      a.  At PADILLA's direction, Market Maker 1 sold approximately 1.28 million FPWM shares between February 25, 2021 and late April 2021, averaging tens of thousands of shares sold per trading day.  As with ONPH shares, Market Maker 1 typically sold FPWM shares short.

      b.  PADILLA then caused Valor Capital to sell FPWM shares to Market Maker 1 to cover Market Maker 1's short sales at prices that allowed Market Maker 1 to earn a profit on the trades.

      c.  During the period that Market Maker 1 was selling FPWM shares short at PADILLA's direction, PADILLA caused Valor Capital to sell more than 2.3 million FPWM shares, generating more than $7.9 million in illicit proceeds. Massachusetts residents purchased shares of FPWM shortly after PADILLA's price manipulation and during the period in which Valor Capital was dumping FPWM shares.

<u>Attempt to Cause the Production of a Fraudulent Foreign Passport</u>

42.     In or about August 2022, PADILLA was arrested and charged with securities fraud.

43.     Between December 2022 and January 2023, PADILLA attempted to acquire a fraudulent Ukrainian passport bearing his photograph from Individual 8.  PADILLA intended to use the passport to flee the United States and avoid prosecution for securities fraud.

44.     Specifically, on or about January 1, 2023, PADILLA sent Individual 8 information via an encrypted messaging application about the requirements for passport photos for Ukrainian passports.

45.     On or about January 2, 2023, PADILLA sent Individual 8 an encrypted message with the fake name that PADILLA wanted on the Ukrainian passport—Petrov Mikhail Aleksandrovich—and stated that he wanted his age to be listed (falsely) as 47.

46.     On or about January 3, 2023, PADILLA sent Individual 8, via the encrypted messaging application, a set of four identical digital photos of himself in the customary orientation of passport photos.

47.     On January 19, 2023, PADILLA caused $15,000 in Tether cryptocurrency to be sent to a cryptocurrency wallet in Massachusetts to pay Individual 8 for the passport's production.

COUNT ONE
Conspiracy to Commit Securities Fraud
(18 U.S.C. § 371)

The Grand Jury charges:

48.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 41 of this Indictment.

49.     From in or about January 2020 through in or about July 2022, in the District of Massachusetts and elsewhere, the defendants,

JOSEPH A. PADILLA and
KEVIN C. DILLS,

conspired with others known and unknown to the Grand Jury to commit securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, that is, to knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the SEC, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities, to wit, shares of Oncology Pharma, Inc. and Charlestowne Premium Beverages, Inc.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
Securities Fraud
(15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. §§ 240.10b-5; 18 U.S.C. § 2)

The Grand Jury further charges:

50.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 36 of this Indictment.

51.     From in or about October 2020 through in or about July 2022, in the District of Massachusetts and elsewhere, the defendants,

JOSEPH A. PADILLA and
KEVIN C. DILLS,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person in connection with the purchase and sale of securities, to wit, shares of Oncology Pharma Inc.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and 18 U.S.C. § 2.

## COUNT THREE
Securities Fraud
(15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. §§ 240.10b-5; 18 U.S.C. § 2)

The Grand Jury further charges:

52.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 30 and 37 through 41 of this Indictment.

53.     From in or about January 2020 through in or about April 2021, in the District of Massachusetts and elsewhere, the defendant,

### JOSEPH A. PADILLA,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person in connection with the purchase and sale of securities, to wit, shares of Charlestowne Premium Beverages Inc.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and 18 U.S.C. § 2.

<u>COUNT FOUR</u>
Attempt to Cause the Production of an
Identification Document Without Lawful Authority
(18 U.S.C. §§ 1028(a)(1), (b)(2)(A), and (f); 18 U.S.C. § 2(b))

The Grand Jury charges:

54.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 47 of this Indictment.

55.     In or about December 2022 and January 2023, in the District of Massachusetts and elsewhere, the defendant,

JOSEPH A. PADILLA,

did knowingly attempt to cause the production without lawful authority of an identification document, authentication feature, or a false identification document, to wit, a fraudulent Ukrainian passport, the production of which was in or affected interstate or foreign commerce.

All in violation of Title 18, United States Code, Sections 1028(a)(1), (b)(2)(A), and (f); and 18 U.S.C. § 2(b).

<u>FORFEITURE ALLEGATION</u>
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

56.    Upon conviction of one or more of the offenses set forth in Counts One through

Three, the defendants,

JOSEPH A. PADILLA and
KEVIN C. DILLS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the offenses.

57.    If any of the property described in Paragraph 56, above, as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendant --

       a.    cannot be located upon the exercise of due diligence;

       b.    has been transferred or sold to, or deposited with, a third party;

       c.    has been placed beyond the jurisdiction of the Court;

       d.    has been substantially diminished in value; or

       e.    has been commingled with other property which cannot be divided without
           difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendant up to the value of the property described in Paragraph 56 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(2)(B) & 18 U.S.C. § 1028(b))

58.     Upon conviction of the offense in violation of Title 18, United States Code, Section 18 U.S.C. §§ 1028(a)(1), (b)(2)(A), and (f), set forth in Count Four, the defendant,

JOSEPH A. PADILLA,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(B) any property constituting or derived from proceeds obtained, directly or indirectly, as a result of such offense; and pursuant to Title 18, United States Code, Section 1028(b), any personal property used, or intended to be used, to commit, the offense.

59.     If any of the property described in Paragraph 58, above, as being forfeitable pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1028(b), as a result of any act or omission of the defendant --

       a.  cannot be located upon the exercise of due diligence;

       b.  has been transferred or sold to, or deposited with, a third party;

       c.  has been placed beyond the jurisdiction of the Court;

       d.  has been substantially diminished in value; or

       e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Sections 982(b)(2) and 1028(b), each incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property described in Paragraph 58 above.

All pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1028(b).

A TRUE BILL

_____
FOREPERSON

_____
JAMES R. DRABICK
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: March _21_, 2023
Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK

24