UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 23-cr-10075-RGS-MPK |
| | ) | |
| JOSEPH A. PADILLA and | ) | |
| KEVIN C. DILLS, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION**
**FOR REVOCATION OF PRE-TRIAL RELEASE AND DETENTION PENDING TRIAL**

In advance of the May 10, 2023 hearing on the government's motion for revocation of defendant Joseph Padilla's pre-trial conditions of release pursuant to 18 U.S.C. § 3148, the government submits this supplemental memorandum, accompanied by Exhibits 1.A through 1.ZZZ (text messages) and Exhibits 2.A through 2.G (audio recordings) (sealed).[1]   To streamline the hearing, the government will proceed by proffer, with the defendant's assent.  *See* Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f)(2).

## I.   PRELIMINARY STATEMENT

Between mid-December 2022 and mid-January 2023, while on stringent pre-trial release conditions that included location monitoring, the defendant put in motion a sophisticated plan to buy a fake Ukrainian passport and flee the United States to avoid prosecution.   He obtained and provided passport photos from Russia.   He selected a Ukrainian alias and a fake age.   He caused $15,000 in cryptocurrency to be paid.   And he planned how to cut off his GPS bracelet, flee to Mexico by boat, and from there abscond to Russia.   He did all this because, as he said, "I'm just trying to stay out of f****** jail right now."   And when he became "worried" that "people I talked to are like rats or something"—which he worried might disrupt his plan to flee—he decided "to go early . . . without [the passport] . . . and then get it, after."

Fortunately, the defendant's plan was disrupted, but only because his intentions and actions were captured in real time on tape and in consensually recorded text messages.   Those recordings and messages make clear that the defendant—a man of significant financial means—is willing to go to any length to flee this prosecution and that, in turn, pre-trial detention is necessary.   For his

---

[1] The government previously filed an emergency motion for revocation of the defendant's pre-trial release conditions and an arrest warrant (Dkt. 26), which is referred to herein as "Rev. Mot."   The government attached to that motion an affidavit of FBI Special Agent David J. Cirilli (Dkt. 26-1), which is referred to herein as "Rev. Aff.", and several exhibits (Exs. A through H).

part, the defendant recognizes as much, recently telling a third party on a recorded jail call: "I don't see anything positive coming out of this . . . 'cause they're not gonna get me out of here."   For the reasons set forth below, the defendant's pre-trial release should be revoked, and he should be detained pending trial under 18 U.S.C. § 3148.

II.    **BACKGROUND**

A.    **The Complaint and Initial Procedural History**

In late August 2022, the defendant was arrested at the San Diego International Airport on a complaint charging him with securities fraud related to a $7 million pump-and-dump scheme involving the shares of a penny-stock company.   *See* Dkt. 1.   During a search incident to his arrest, agents seized from the defendant, among other things:

- a Mexico permanent residence card and an active multi-year Russia visa reflecting significant travel to Russia, Mexico, and other countries;

- Russia and Kyrgyzstan bank cards in the names of different individuals;

- numerous receipts for luxury retail purchases in Dubai (including in the name of the defendant's long-time Russian girlfriend); and

- a registration document registering the defendant as a foreign tourist in Russia.

*See* Rev. Mot. at 8–9 & Rev. Aff. Exs. G, H.   In advance of his initial appearance in California, the defendant participated in a pre-trial services interview.   *Id.* at 2.   During that interview, Padilla told pre-trial services:   that he owns a United States passport book and card; that he has a single rental home in Mexico; that he has traveled to "Europe," Turkey, and Mexico in recent years; and in discussing his finances, that he is "semi-retired" and receives about $270,000 per year in income from managing his rental property and stock trading.   *Id.* at 2 & Rev. Aff. Ex. B.

In early September 2022, the defendant was released from pre-trial custody in California

2

pursuant to several conditions of release, including: a prohibition on committing a federal, state, or local crime; appearing in court as ordered; complying with home detention and a GPS monitoring program; restricting any probation-approved travel to surrounding counties; not entering Mexico; a prohibition on obtaining a new passport or international travel document; and posting a $1 million appearance bond secured by $200,000 in cash.   *Id.* at 2 & Rev. Aff. Ex. C.

During the defendant's initial appearance in this District on September 9, 2022, this Court affirmed and re-imposed those conditions.   Dkt. 9.   Two weeks later, the defendant posted a $1 million bond secured by one of his residences in Carlsbad, California.   Dkt. 13.   That bond, which the defendant signed, provided that the bond could be forfeited if he failed "to comply with all conditions set forth in the Order Setting Conditions of Release."[2]   *Id.*

While the parties discussed a potential resolution of this matter that would obviate the need to return an indictment (during which time the defendant agreed to extend the Speedy Trial Act deadline), the government assented to the defendant's motion to impose a curfew in lieu of home detention, which the Court granted.   Dkts. 21, 22.   Those discussions proceeded regularly and substantively for several months, during which no concerns about the defendant's mental state were brought to the government's or Court's attention.   In mid-December 2022, however, the discussions concluded without a resolution being reached, and it became clear that an indictment would need to be returned in this matter.

### B.    The Defendant's Attempt to Obtain a Fake Ukrainian Passport to Flee the Country and Avoid Prosecution

Confidential Witness 1 ("CW-1") is an associate of Padilla's who has provided information to the FBI in the past.   Rev. Aff. ¶ 6.   In December 2022, CW-1 was contacted by an individual

---

[2] The government has not yet moved for forfeiture but reserves its right to do so.

associated with Padilla who asked if CW-1 could obtain a foreign passport for Padilla.   *Id.* at ¶ 7.
CW-1 reported this information to the FBI.   Recognizing that this request indicated an intent on
the defendant's part to commit one or more new federal crimes, the FBI directed CW-1 to initiate
communications directly with Padilla about the passport request and any associated intent to flee.[3]
CW-1 created an account on "Silent Circle," which is an encrypted messaging and voice call
application used by Padilla that allows both auto-deletion and manual deletion of messages,
including deletion of previously sent messages so that they are no longer available on a recipient's
phone.   *Id.* at ¶ 8.   CW-1 then began communicating with Padilla, who used the Silent Circle
username "drago88", and captured the communications as consensual audio recordings of calls
and pictures of text messages.   *Id.*   Those calls and messages—which reflect Padilla's deliberate,
willful, and unabashed effort to acquire a fake Ukrainian passport from CW-1, who pretended to
be willing to help Padilla do so—are attached in Exhibits 1.A–1.ZZZ (text messages) and 2.A–2.F
(sealed recordings).   *See also* Rev. Aff. ¶¶ 9–23.   They are also summarized below.

On December 28, 2022, CW-1 asked Padilla how he was doing via text message on Silent
Circle, and Padilla responded: "I'm ok brother!   Just dealing with this crap everyday."   Ex. 1.A.
The defendant and CW-1 then spoke by phone.   *See* Ex. 2.A.   During that recorded call, Padilla
told CW-1 that he was "dealing with all this crap . . . it's coming from everywhere."   *Id.* at 1:10–
18.   In response, CW-1 told Padilla that he understood Padilla needed "some help," to which
Padilla responded, "yeah, if possible."   *Id.* at 1:41–52.   Padilla and CW-1 then discussed the type
and size of passport photos that Padilla would need to provide CW-1 in order for CW-1 to obtain

---

[3] The FBI to admonished CW-1, among other things, to limit his proactive efforts to obtain
evidence to communications about the defendant's request for a passport and his plan for flight.
Rev. Aff. ¶ 8, n.1.

a fake Ukrainian passport for Padilla.   *Id.* at 1:50–2:50.   Padilla and CW-1 also briefly discussed

how, once Padilla obtained the passport, he would "get out," which Padilla called the "big plan":

```
PADILLA:  Ok. But do you know what the exact size?
CW-1:     2x2. Yeah it's the small one. It's because its
          Europe, right? Like Ukraine is same as Europe?
          So here is I think is 2x2.5. What's the US size?
          2.5x2.5?
PADILLA:  I have no idea.
CW-1:     And these? are smaller. They're just 2x2.
PADILLA:  Ok.
CW-1:     So they're smaller sizes, just so you know that.
PADILLA:  Ok. So I need 2x2.
CW-1:     2x2, yeah. On the white, uh, background.
PADILLA:  Yeah I know.
```

```
CW-1:     Oh you know, ok.
PADILLA:  Yeah.
CW-1:     [laughing]
PADILLA:  [laughing]
CW-1:     Yeah they basically [unintelligible]. But
          whatever.
PADILLA:  Yeah. I'll figure it out.
CW-1:     And then the rest, when it's ready, we can talk.
PADILLA:  Ok.
CW-1:     Because I mean how are you gonna get out, as well
          right?
PADILLA:  Yeah. That's gonna be the big-big plan.
```

*Id.* at 2:20–3:08.   They spoke the following day further about the format of the photos that CW-1

needed in order to get a Ukrainian passport for Padilla.   *See* Ex. 1.B; *see also* Rev. Aff. ¶ 10.

On December 30, CW-1 and Padilla again spoke on a Silent Circle call, which CW-1

recorded.   Ex. 2.B.   Padilla stated that he was erasing their Silent Circle text messages.   *Id.* at

0:15–30.   CW-1 confirmed the size of the passport photos Padilla needed to provide for a

Ukrainian passport, and then they discussed a "different name" to be used in Padilla's fake

passport, with Padilla indicating that he wanted to choose "something easy":

```
19 CW-1:     So listen - it's forty-five, I just
20           remeasure what I have and uh so it's like
21           Ukrainian right, passport, so you need to, if you
22           want different name, you need to think about that.
23 PADILLA:  Yeah, something easy.
```

*Id.* at 0:30–45.   When CW-1 further stated that he would need to fly to Europe to pick up the

passport physically for Padilla, Padilla told him: "Alright, my brother.   Appreciate all your help."

*Id.* at 1:35–2:22.   On January 1, 2023, Padilla sent CW-1 several Silent Circle text messages to

5

confirm the size and format requirements for a Ukrainian passport photo:

 

*See* Exs.1.C, D, E, F (Padilla's messages appear on the left, next to the letters "DR" for "drago88").

The next day, Padilla sent a series of Silent Circle text messages to CW-1. In the messages, Padilla: (i) asked CW-1 how many copies of the passport photos he needed; (ii) told CW-1 that he was having the photos sent from "the motherland" (*i.e.*, Russia); and (iii) when CW-1 told him to "pick a name" for the fake passport, Padilla provided an alias of "Mikhail Petrov":



Ex. 1.G.   Later that day, CW-1 told Padilla that his alias required a middle name, to which Padilla

responded by changing the alias to "Petrov Mikhail Aleksandrovich."   Ex. 1.H.   Padilla asked

CW-1 to confirm that the fraudulent Ukrainian passport would appear "real and official," and

Padilla—who is in his mid-fifties—told CW-1 that he wanted the passport to reflect a different

age—"I want to be 47," he said:



Ex. 1.H.

As shown below, Padilla then told CW-1, "I need your address in Cali," so that he could mail CW-1 the photos. Ex. 1.I. Padilla worried about trusting the mail: "Or you can meet me somewhere in San Diego if we don't want to trust the mail." *Id.* CW-1 assured Padilla that they could "trust" the mail, but told him, "I'll meet you any ways [s]o we can plan the second part," referring to Padilla's flight. *Id.* Padilla responded: "Kk." *Id.* Then, Padilla *again* sent his alias to CW-1, "Petrov Mikhail Alexandrovich. Just in case you didn't save it," referring to his deletion of messages. Ex. 1.J. CW-1 responded, "Got it . . . Lol," and Padilla laughed, "Hehe." *Id.*



On January 3, Padilla called CW-1 on Silent Circle.   Padilla told CW-1 that he had some

"good news" on getting the passport photos, which Padilla stated he had someone create for him

"in the motherland," a reference to Russia.   Ex. 2.C at 0:46–1:48.   Padilla then told CW-1 that he

could send CW-1 the photos on Silent Circle (to avoid the mail), that the photos were "done

professionally," and that CW-1 could then send the photos "to your guy" to make the passport:

```
19  PADILLA:   So- so I have some, uh, some good news on the
20             thing I need to get you.
21  CW-1:      Ok good.
22  PADILLA:   Uh- uh, so I had it professionally done at the-
23             in the- the motherland.
24  CW-1:      Uh-huh.
1   PADILLA:   And, they sent it to me in electronic form, so, I
2              can just send it to you on here. And, if you
3              want, you can send it to your guy.
4   CW-1:      H- h- how- You- you need to tell me, how I am
5              saving the it actually--I don't know.
6   PADILLA:   Uh, I would just save it as a photo.
7   CW-1:      No, no, but I never saved here file on the- on
8              this
9   PADILLA:   Oh, oh its easy. Once you-
10  CW-1:      I mean s-s-s-send me whatever. I'll just gonna
11             try to play with it.
12  PADILLA:   Yeah, so when you get a picture, just tap on the
13             picture and they'll say, "Save to", uh, "Gallery"
14             and so forth. So, anyways this thing is done
15             professionally so
16  CW-1:      OK yeah.
17  PADILLA:   it will print- it will print professionally.
18             Right sizes.
```

*Id.* Padilla told CW-1: "it's made out perfectly so when it prints out you have the perfect size," and that all CW-1 would need to do is "cut it." *Id.* Two minutes after the call ended, Padilla sent CW-1 the passport photos bearing Padilla's face:

 

Exs 1.L, M.

On January 7, Padilla texted CW-1 to check-in on the status of the passport, asking "everything good?"  Exs. 1.P–S.  They arranged to speak the following Monday.  *Id.*    On January 9, Padilla and CW-1 again spoke during a recorded Silent Circle call, and after small talk, Padilla immediately asked about the passport photos: "What you got from me is ok?   It's good?"  Ex. 2.D at 0:43–58.   CW-1 told Padilla that he "sent it to the guys" in Europe to be made, and that he would pick up the passport in person at the end of January.  *Id.*   CW-1 then told Padilla that he needed to pay the individuals making the passport, to which Padilla responded, "Yeah.   Ok."  *Id.* at 0:58–1:13.   CW-1 asked: "You are going to pay me or I am doing for free?   Tell me."  Padilla laughed, and then assured CW-1 that he would pay him:

```
1    PADILLA:  OK. And what I- what you got from me is OK? It's
2              good?
3    CW-1:     Uh, yes, yes. I sent it to the guys there.
4    PADILLA:  OK.
5    CW-1:     I'm just not gonna be able to pick it up until
6              probably the end of the month because I need to
7              be there personally.
8    PADILLA:  OK.
9    CW-1:     And, uh, then I'm gonna also give him, uh, you
10             know, money. I need to give him money.
11   PADILLA:  Yeah. OK.
12   CW-1:     You are going to pay me or I am doing for free?
13             Tell me.
14   PADILLA:  [laughter] Of course [unintelligible]. Of course.
```

*Id.*  CW-1 joked that he would send Padilla a bill, stating "to my brother Joseph, the bill for services [laughing], tips and taxes included."  *Id.* at 1:38–2:06.  Padilla laughed in response and said "all right my friend."  *Id.*  CW-1 and Padilla then discussed meeting in person in California to discuss the "other stuff"—Padilla's plan to flee the United States—with Padilla noting that he had to stay in San Diego County due to his conditions of release.  *Id.* at 2:26–45.

On January 13, Padilla and CW-1 continued to discuss a time and place for an in-person meeting to discuss Padilla's plans to flee the country.   When CW-1 asked "where do you want to meet bro?", Padilla responded "let me think of a good safe place."  Ex. 1.U.  Padilla later added: "Thank you brother for all your help!   Your [*sic*] my new angel [heart emoji]."  Ex. 1.W.

The next day, Padilla picked-up CW-1 and drove to a park in Carlsbad, California, and CW-1 recorded their discussion about Padilla's plan to flee the United States to Mexico, and then

from Mexico to Russia, once he received his Ukrainian passport.[4]   Rev. Aff. ¶ 20.   Before they

arrived at the park, Padilla laughed and told CW-1 he was worried about being followed: "You

know I'm just kind of driving around right now just . . . so I make sure no one is following us right

now." Ex. 2.E at 15:00–15.   He also said: "I'm just trying to, like, stay out of f****** jail right

now." *Id.* at 8:15–21.   During their meeting, Padilla and CW-1 discussed various ways for

Padilla to flee from the United States to Mexico, and then to travel from there to Russia using the

fake passport.   Rev. Aff. ¶ 20.   Padilla proposed one option—walking across the border after

cutting off his GPS bracelet—but he noted that authorities would respond within "seven to ten

minutes" and they would be "looking for" him at the border:

```
12   PADILLA:  You know, I think the best way to do it would be
13             to walk across? Because, it would have to be like
14             maybe a week later? Because if you do it right
15             away they're gonna be wa- looking for you, right?
16   CW-1:     Yeah but then you need to-
17   PADILLA:  Yeah and then take off [unintelligible]
18   CW-1:     This is the easy- this is the part I don't know.
19   PADILLA:  But I'll have to leave because they'll be there
20             in like seven minutes.
21   CW-1:     Seven minutes?
22   PADILLA:  Seven to ten minutes.
23   CW-1:     [unintelligible] How- how far you can go with
24             this?
1    PADILLA:  I can go, all the way- I just can't go to a
2              border town. So I can get all the way-
3    CW-1:     From there you can go right?
4    PADILLA:  Yeah.
```

Ex. 2.E at 26:52–27:55.   Padilla also considered flying to Mexico, but noted it was "not the

safest way" even if he "had a passport in someone else's name":

---

[4] Portions of the recording are unintelligible at this time.

```
 7   PADILLA:   Look, an airport right here.

 8   CW-1:      Is it a big one, or?

 9   PADILLA:   You can fly private out of there.

10   CW-1:      Oh. Oh. Yeah? How- how do they check in?

11   PADILLA:   I mean I'm sure they, you know, you have to give

12              the manifest but if I already had a passport in

                someone else's name….

13   CW-1:      Yeah.

14   PADILLA:   It's not the safest way.
```

*Id.* at 59:50–1:00:46.   Ultimately, Padilla settled on fleeing to Mexico via a boat owned by CW-1.   *See id.* at 32:42–33:30; Rev. Aff. ¶ 20.   Padilla confirmed that CW-1 would have the fake passport stamped from Ukraine, and Padilla also stated multiple times that he had "someone" to stamp it for him in Mexico:

```
20   PADILLA:   But you'll stamp it for me.

21   CW-1:      Yeah.

22   PADILLA:   And then I have somebody that can maybe stamp it

23              in Mexico for me too.
```

```
24   CW-1:      Money, experience, [unintelligible]! OK, OK, let

 1              me check about the boat, because the boat works.

 2              And then you kinda out and then in Mexico you

 3              have someone to stamp the passport for you.

 4   PADILLA:   Yeah I think so.
```

Ex. 2.E at 26:00–12, 32:40–33:00.   Padilla considered whether it would be better to (i) cut off his bracelet, hide in the United States, and then wait before fleeing to Mexico, or (ii) "cut it and just go" immediately:

```
17   PADILLA:  Yeah. I mean, I've been thinking about this a lot
18             [unintelligible] but, like, I don't know if it's
19             like better do it like, cut it and just go?
```

*Id.* at 29:15–42.

When CW-1 and Padilla began to discuss how Padilla was going to pay CW-1 for the fake passport, they settled on cryptocurrency, with Padilla telling him: "Yeah, don't worry about that part.   That part's gonna be easy.   That's the easy part.   [Laughing].   The hard part is, everything else."   *Id.* at 59:50–1:00:01.   Toward the end of their discussion after they left the park, Padilla asked CW-1 to find out from the captain of CW-1's boat whether it would be feasible for Padilla to enter Mexico via CW-1's boat.   *Id.* at 1:00:38–59.

The day following their meeting, Padilla sent CW-1 a text message via Silent Circle asking about the status of the passport and boat plan, "Hey my brother.   How's it going," to which CW-1 responded, "All is good.   Working on it."   Ex. 1.X.

On January 17, CW-1 sought payment: he sent Padilla a text message via Silent Circle containing a QR code associated with a cryptocurrency wallet set-up by the FBI in Massachusetts, into which Padilla would transfer funds for the fake passport.   Ex. 1.Y.   Other than government agents, prosecutors, and CW-1, the only person who had access to the wallet was Padilla.   Rev. Aff. ¶ 19.   Two days later, the FBI cryptocurrency wallet received $15,010 worth of Tether cryptocurrency, and Padilla sent CW-1 text messages via Silent Circle telling him to check to

confirm that he received the money; CW-1 confirmed that there was "15 in," and Padilla said "thank you my brother":

 

Exs. 1.Z, 1.ZZ, 1.ZZZ.

On January 19, counsel for Padilla contacted one of the undersigned AUSAs to ask if the government would assent to extending Padilla's 9am to 7pm curfew by several hours, particularly in the early morning hours. When the AUSA proposed postponing any discussion of Padilla's conditions of release to Padilla's anticipated forthcoming arraignment, Padilla's counsel asked whether there were violations that counsel did not know about and whether the government would be seeking to revoke Padilla's pre-trial release. The AUSA declined to respond substantively for fear of inadvertently causing Padilla to flee early.[5]

---

[5] To be clear, there is no reason to believe Padilla's counsel had any knowledge of Padilla's plan to flee and attempts to obtain a fake passport.

16

The day after counsel's conversation with the government, on January 20, Padilla called CW-1 via Silent Circle and stated he was "worried."   Ex. 2.F.   When CW-1 told Padilla that he would be flying to Europe to pick-up the fake passport in two weeks, Padilla indicated that he was "worried" that "rats" had tipped-off the government about his efforts to flee:

```
24 PADILLA:  Well, I was gonna ask you something. Uh,uh
 1 CW-1:     Come what?
 2 PADILLA:  -try to arrest me. They're gonna- He said that
 3           they might c- try to re-arrest me.
 4 CW-1:     Why?
 5 PADILLA:  Um, he says they wouldn't tell him. He says it's
 6           p- it's something privy and I don't know why.
 7           Like maybe, I don't know, someone said something,
 8           or something. Um, it's- so- I'm a little worried
 9           about that. Um-
10 CW-1:     That's strange.
11 PADILLA:  Yeah. Strange.
12 CW-1:     What, you did something, uh, right now?
13 PADILLA:  No, I mean, other than maybe, maybe some other
14           people I talked to are like rats or something but
           ...
```

*Id.* at 0:39–1:42.   Padilla then proposed expediting his plan to flee to Mexico via boat—to "go early"—without the passport, and getting it from CW-1 later:

```
17 PADILLA:   I'm not. But, I- I'm thinking I should maybe try

18             to go early.

19 CW-1:      Uh.

20 PADILLA:   You know, with- without it.

21 CW-1:      Yeah.

22 PADILLA:   And then get it, after.

23 CW-1:      OK.
```

*Id.* at 1:42–57.   Padilla asked CW-1 to find out if his boat could be ready "by Sunday"—two days

later—to flee to Mexico, and to be "discrete" when he asked the boat captain:

```
24 PADILLA:   What's your thoughts on that?

1  CW-1:      I don't know bro. You have everything ready? Or

2             not yet?

3  PADILLA:   Mmmmm- nah. I just wanted to see- ask you, if you

4             think the guy would be- could be ready by Sunday.

5  CW-1:      Uh, let me ask him I'll call you back. Hold on.

6  PADILLA:   Yeah.

7  CW-1:      You going to work out anyways right?

8  PADILLA:   Yeah, I'm gonna work out.

9  CW-1:      OK. I'll- I'll

10 PADILLA:   Just be- just be discrete when you talk to the

11            guy.
```

*Id.* at 1:57–2:25.   Padilla also told CW-1: "Also I need to know, like what's the nearest port, like,

you know, by that crossing area."   *Id.* at 2:27–40.

That day, the government filed an emergency *ex parte* motion for revocation of release

seeking an arrest warrant.   Dkt. 26.   After the Court found probable cause to believe that Padilla

had violated his conditions of release by committing a new federal crime—attempting to cause the

production of an identification document without lawful authority—and issued an arrest warrant, Padilla was arrested later that afternoon.   Dkt. 32 at 2, 42.

### C.    The Indictment and Recent Procedural History

Following his arrest, Padilla was detained and transferred to the District of Massachusetts, where he is presently detained at Wyatt.   On March 24, a four-count indictment against Padilla and his co-defendant Kevin Dills was unsealed, charging Padilla with conspiracy to commit securities fraud, two substantive counts of securities fraud (including a $150 million securities fraud not charged in the complaint but which the government had forewarned Padilla's counsel about), and attempt to cause the production of an identification document without lawful authority, based on his attempt to obtain a fake passport and flee while on pre-trial release.   Dkt. 38.   The Court has set a trial date of October 23, 2023.   Dkt. 59.

On March 6, before Padilla was indicted but after the government produced to defense counsel all the recordings and text messages related to the passport, Padilla spoke with his U.S. girlfriend via phone from Wyatt.   *See* Ex. 2.G.   Padilla told her "I don't see anything positive coming out of this [detention hearing] . . . 'cause they're not gonna get me out of here."   *Id.* at 2:29–40.   Padilla evaluated his chances of release once an indictment was returned as follows:

```
2 PADILLA:  So, I'm gonna tell him that today. I feel like,
3           any way that you could object to that and try to
4           get an earlier hearing? Cause, you know, you're
5           gonna have an indictment, which is gonna be all
6           negative shit, and then you're gonna try to do a
7           bail hearing afterwards? [laughing]
8 GIRLFRIEND: [laughing]
9 PADILLA:  [laughing] You might as well throw the keys away.
```

*Id.* at 5:05–32.

III.   **APPLICABLE LAW**

Under 18 U.S.C. § 1028(a), it is a crime to knowingly and without lawful authority cause, or attempt to cause, the production of an identification document, authentication feature, or false identification document, such as a fake passport.   *See* 18 U.S.C. §§ 1028(a)(1), (b)(2)(A), (f); 18 U.S.C. § 2(b).

A defendant who violates his pre-trial conditions of release "is subject to revocation of release, an order of detention, and a prosecution for contempt of court."   18 U.S.C. § 3148(a). Under Section 3148(b), the Court "shall" enter an order of revocation and detention if the Court finds two conditions are satisfied:

> (1) [the Court] finds that there is—
>
>> (a) probable cause to believe that the person has committed a federal, state, or local crime while on release; or
>>
>> (b) clear and convincing evidence that the person has violated any other condition of release; and
>
> (2) [the Court] finds that—
>
>> (a) based on the factors set forth in Section 3142(g) . . . there is no condition or combination of conditions of release that will assure that the person will not flee . . .; or
>>
>> (b) the person is unlikely to abide by any condition or combination of conditions of release.

18 U.S.C. § 3148(b).   Section 3148's use of the term "shall" indicates that the statute is mandatory, not permissive.   *See United States v. Jittaphol*, 598 F. Supp. 3d 22, 36 (D. Mass. 2022) (Wolf, J.) (noting that "revocation of release and detention are . . . required when both prongs . . . are satisfied").

Importantly, there is a statutory rebuttable presumption of detention if the Court finds probable cause to believe the defendant committed a crime while on pre-trial release.   *See* 18

U.S.C. § 3148.  In other words, "an affirmative finding on the first prong helps lead to an affirmative finding on the second prong."  *United States v. Alfonso*, 284 F. Supp. 2d 193, 202 (D. Mass. 2003) (Young, J.).

Applying this statutory presumption, courts in this district have frequently ordered defendants detained where there was probable cause to believe they committed a new federal, state, or local crime while on pre-trial release—often for significantly less serious offenses than here, attempting to obtain a fake passport to flee federal prosecution.  *See, e.g.*, *Alfonso*, 284 F. Supp. 2d at 204 (affirming Magistrate Judge's order of revocation based on probable cause the defendant possessed cocaine); *see also Jittaphol*, 598 F. Supp. 3d at 36–37 (revoking defendant based on probable cause to believe he possessed methamphetamine while on pre-trial release); *United States v. Couture*, 2022 WL 483830, at *2–3 (D. Mass. Feb. 11, 2022) (Boal, J.) (detaining defendant based on probable cause to believe that he committed obstruction by creating fake documents); *United States v. Josaphat*, 2021 WL 2712270, at *1 (D. Mass. July 1, 2021) (Boal, J.) (same, where there was probable cause to believe defendant, indicted for bank fraud, committed drug offense while on pre-trial release); *United States v. Dozier*, 2013 WL 1187236, at *1 (D. Mass. Mar. 20, 2013) (revoking defendant due to probable cause that he committed the crime of failing to register as a sex offender while on pre-trial release, even though "it is very doubtful" that he would be charged or convicted of such a crime); *United States v. Gennaco*, 834 F. Supp. 2d 38, 42–43 (D. Mass. 2011) (Gorton, J.) (affirming then-Magistrate Judge Sorokin's revocation order for a defendant who obtained $31,000 under false pretenses while on pre-trial release); *United States v. Rivera*, 104 F. Supp. 2d 159, 160 (D. Mass. 2000) (Gorton, J.) (reversing Magistrate Judge's denial of revocation motion based on defendant's possession of marijuana).

The government is not aware of any case in this District in which a defendant who fled or attempted to flee while on pre-trial release was not subsequently detained pending trial.   Indeed, detention is not only ordered, but regularly uncontested, in such circumstances.   *See, e.g.*, *United States v. Xigoros*, 21-cr-10283-NMG-JCB, Dkt. 67 (voluntary order of detention where defendant attempted to flee while on pre-trial release); *United States v. Guerrero*, 17-cr-10388-LTS-DLC, Dkt. 132 (same, where defendant fled while on pre-trial release and was later captured); *United States v. Letourneau*, 15-cr-10156-DJC-DLC, Dkt. 88 (same, where defendant remained in United States but fled to different state while on pre-trial release).

## IV.   **ARGUMENT**

No better evidence of risk of flight exists than evidence that a defendant *actually attempted to flee*.   Here, while on pre-trial release under strict conditions—including location monitoring and seven-figure secured bonds—the defendant attempted to flee the country to avoid prosecution by obtaining a fake Ukrainian passport.   Padilla's conduct was not a heat-of-the-moment error in judgment, a stress-induced momentarily lapse, or the product of a purported medical issue: over a nearly one-month period he went to elaborate lengths planning to flee and took the initiative in doing so.   From this conduct (and the evidence capturing it) flows two conclusions.   First, the recorded calls and text messages provide ample probable cause to believe Padilla committed a federal crime by attempting to cause the production of a fake passport.   Indeed, a federal grand jury has since issued an indictment that includes the charge.   Accordingly, the statutory presumption of detention applies under Section 3148(b)(1), and the defendant's attempted flight, standing alone, warrants pre-trial detention because it is "unlikely" he will abide by any conditions of release under Section 3148(b)(2)(B).   Second, the Section 3142(g) factors similarly weigh overwhelmingly in favor of detention, including especially when consideration is given to the

defendant's strong financial and personal ties to Russia and his misleading omissions to pre-trial services.

A.      **The Presumption of Detention Applies Because There is Probable Cause to Believe the Defendant Committed a Crime while on Release**

For three independent reasons, there is ample probable cause to believe Padilla committed a new federal crime while on pre-trial release, specifically, a violation 18 U.S.C. § 1028(a).

First, in March 2023, the defendant was indicted for attempting to cause the production of an identification document without lawful authority.  *See* Dkt. 38 at ¶¶ 42–47, 54–55 (Count Four).  It is well-established in this District that a grand jury indictment, standing alone, is sufficient to trigger the statutory presumption of detention under Section 3148(b)(1)(A).  *See, e.g.*, *Couture*, 2022 WL 483830, at *3 ("With respect to the first prong, the return of the January 20, 2022, indictment is sufficient to establish probable cause that Couture committed a federal, state, or local crime while on pretrial release."); *Gennaco*, 834 F. Supp. 2d at 42 ("First, the superseding indictment gave rise to probable cause that the defendant had committed a crime while on pre-trial release, which supports the rebuttable presumption[.]"); *accord United States v. Vargas*, 804 F.2d 157, 163 (1st Cir. 1986) ("[A] grand jury indictment is sufficient to establish probable cause for purposes of triggering the rebuttable presumption[] [of detention]."). Accordingly, the Court need go no further to determine whether the presumption applies, and can proceed directly to Section 3148(b)(2).

Second, when it issued an arrest warrant, this Court already found probable cause that the defendant had committed the crime for which he is now indicted.  The Court issued that arrest warrant based on the affidavit submitted in support of the government's revocation motion, which summarized the very same recordings and text messages that are now before the Court.  *See* Dkt. 26.  Again, the Court need not proceed further to apply the presumption of detention.

23

<u>Third</u>, even setting aside the indictment and the Court's arrest warrant, the evidence before the Court provides far more than probable cause to believe Padilla committed a crime while on pre-trial release.   "The probable cause standard does not even require that the government make its showing by a preponderance of the evidence," *Alfonso*, 284 F. Supp. 2d at 203, and instead merely requires a person "of reasonable caution in the belief that the defendant has committed a crime while on bail," *Jittaphol*, 598 F. Supp. 3d at 27.   That evidence includes, but is not limited to, numerous text messages and recordings in which the defendant: (i) confirmed that he wanted a Ukrainian passport produced for him; (ii) said that he wanted it to look "real and official;" (iii) discussed the sizes and other requirements for passport photos with CW-1 at length; (iv) sent CW-1 a fake name to be used in the passport; (v) directed CW-1 to change his age to 47 in the passport; (vi) sent CW-1 passport photos to use; (vii) told CW-1 that he needed the passport stamped in Ukraine and that he "had someone" to stamp it in Mexico; (viii) caused $15,000 in cryptocurrency to be paid for the passport; and (ix) told CW-1 he planned to "go early without [the passport] and then get it, after" when he became worried that someone had tipped off the government about his plan.   *Supra* Part II.B.

In sum, the probable cause standard is already—and easily—satisfied by the indictment, this Court's issuance of an arrest warrant, and the evidence now before the Court.   Accordingly, the presumption of detention under Section 3148(b)(1) applies.[6]

---

[6] Independently, while the clear and convincing standard under Section 3148(b)(1)(B) is more demanding than probable cause, the evidence is also more than sufficient to establish by clear and convincing evidence that the defendant violated his conditions of release, which required him to, among other things, surrender his passport and not attempt to obtain a new one.

### B.      The Defendant's Attempted Flight to Avoid Prosecution, Standing Alone, Warrants Detention Under Section 3148(b)(2)(B)

The Court can proceed directly to Section 3148(b)(2)(B) because the defendant "is unlikely to abide by any condition or combination of conditions of release."   18 U.S.C. § 3148(b)(2)(B). "In contrast to 18 U.S.C. § 3148(b)(2)(A), § 3148(b)(2)(B) does not, by its terms, require that the court consider the factors set forth in § 3142(g) in deciding whether to revoke release and detain a defendant because []he is unlikely to obey any combination of conditions of release."   *Jittaphol*, 598 F. Supp. 3d at 37.   Particularly where the presumption of detention applies, courts in this District have frequently revoked pre-trial release under Section 3148(b)(2)(B)—even where the defendants committed crimes on pre-trial release that had nothing to do with flight or obstruction. *Supra* Part III.

Here, the defendant has already shown, at the very least, that he is "unlikely" to abide by conditions of release.   At the time he was taking extensive steps to flee to Mexico and then to Russia with a fake passport, the defendant had already been on a combination of perhaps the strictest conditions that the Court can impose: home detention (and then a curfew); GPS monitoring; location restrictions; and seven-figure secured bonds.   The defendant's own recorded words confirm he will not abide by conditions of release, including location monitoring.   For example, while telling CW-1 that he was "just trying to stay out of f****** jail," he said he had been "thinking about [his flight plan] a lot," and considering whether he should "cut [his GPS bracelet] and just go" immediately or cut it off, hide, and then cross the border later.   He even talked about how quickly authorities would respond after he cut off his GPS bracelet: "I'll have to leave because they'll be there in like seven minutes."   Padilla's words—and his calm, deliberate, often-laughing voice captured on tape—are not the words of a person who purportedly suffered a psychological "break."   The defendant's own admissions, captured on tape, echo this Court's

25

words in detaining a defendant who was less of a flight risk than he is: "[P]eople can cut off a bracelet and drive away.  And I've had clients myself just cut off a bracelet and take off."  *See United States v. Newton*, 21-cr-10035-GAO-MPK, Dkt. 45 (ordering detention for defendant, who had not attempted to flee, based on defendant's significant ties to Kenya, even though defendant was a naturalized U.S. citizen, had lived in the U.S. for three decades, had two children in the U.S., and offered a $1 million secured bond).[7]

The defendant's actions are telling and his intentions are clear.  Knowing that he would forfeit seven-figure bonds, aware that he would instantly become an international fugitive, and conscious of the fact that he would likely need to live in perpetuity in Russia and never be able to return to the country where his children are located, the defendant nevertheless prepared to flee, took numerous steps to have a fake Ukrainian passport created (including paying $15,000 for it), and then tried to *expedite* his flight when he thought he might get re-arrested imminently.  It is a significant understatement to say that Padilla is "unlikely" to comply with any conditions of release—be they a bond, home detention, location monitoring, third-party custodian, or any other condition—because he has already demonstrated, by his own words and actions, that he will not.

### C.     Even if the Court Considers the Section 3142(g) Factors, They Counsel Strongly in Favor of Revocation and Detention

Although the defendant should be detained under Section 3142(b)(2)(B), if the Court considers the risk-of-flight factors under Section 3142(b)(2)(A), those too counsel strongly in favor of detention and a finding, by a preponderance of the evidence, that "no condition or combination

---

[7] *See also United States v. Guerrero*, 17-10388-LTS (defendant released on electronic monitoring removed bracelet and was extradited from the Dominican Republic after fifteen months); *United States v. Letourneau*, 15-10156-DJC (defendant released on electronic monitoring with four third-party custodians removed bracelet and was fugitive for seventeen months before being apprehended in Colorado).

of conditions of release [] will assure that [he] will not flee," particularly in the context of the presumption of detention.  *See* 18 U.S.C. § 3148(b)(2)(A).  Courts in this District have detained defendants posing similar flight risks—even where they did *not* attempt to flee, did not face a presumption of detention, and proposed to "hire private guards to assure [their] appearance."  *See United States v. Klyushin*, 21-cr-10104-PBS-MBB, Dkt. 34 at 4.

First, the defendant's ties to foreign countries, particularly Russia, favor detention.  *See* 18 U.S.C. § 3142(g)(3)(A).  To be sure, the defendant has personal ties to the United States (but not Massachusetts); however, his personal and financial ties to Russia are significant.  And despite his personal ties to California, the defendant already tried to flee to Russia, and not without reason: he has a long-term Russian girlfriend there; he agreed to purchase a residence in Russia with that girlfriend; he controlled approximately $30 million in a Russian bank at the time of his arrest; he was arrested with Russian and Kyrgyzstan bank cards in the names of different individuals; and he has an active multi-year Russian visa.  *Supra* Part I.A; *see also* Rev. Aff. Exs. E, F.  As courts in this District and elsewhere have found in detaining individuals with significant Russian ties, the lack of an extradition treaty strongly weighs in favor of detention.  *See, e.g.*, *Klyushin*, 21-cr-10104-PBS-MBB, Dkt. 34 at 4; *see also United States v. Shuklin*, 2020 WL 2992522, at *1 (6th Cir. Mar. 18, 2020) (affirming detention of a United States resident, based in part on his "strong ties overseas (including [in] Russia, which does not provide for extradition"); *United States v. Kachkar*, 701 F. App'x 744, 747 (11th Cir. 2017) (affirming detention of a United States resident who had traveled extensively to Russia and Libya, "countries for which the United States does not have an extradition treaty").  Padilla also has significant ties to Mexico—a country where, as he planned, he could hide pending travel to Russia, and where he owns several houses, has a

permanent residence card, and apparently "has someone" to stamp a fake passport.   *See* Rev. Aff. Exs. D, G.

      <u>Second</u>, almost as concerning as these foreign ties, Padilla knowingly omitted or minimized them when interviewed by pre-trial services.   He told pre-trial services that he had a U.S. passport and card, omitting that he has an active multi-year Russian visa and Mexico permanent residence card.   Rev. Aff. Exs. B, G.   In discussing his assets and financial status, he disclosed that he earns approximately $270,000 annually, failing to mention that he has $30 million in a Russian bank.   *Id.*, Exs. B at 2, F.   He did not disclose the residence in Russia or his Russian girlfriend.   *Id.,* Ex. B.   And he disclosed only one of the homes he owns in Mexico.   *Id.*   It is perhaps an honest oversight during a stressful day if a defendant failed to disclose *one* of those facts to pre-trial services.   It is something else when a defendant fails to disclose all of them—and then goes on to try to flee the country.   Considering this willingness to hide information from the Court, and of course his disregard and disrespect for the conditions of release this Court imposed, any evidence or arguments the defendant seeks to offer to rebut the presumption of detention should be received with skepticism.[8]

      <u>Third</u>, the nature and circumstances of the offenses charged, the weight of evidence against Padilla, and the potential penalties also support detention.   To start, the nature of his passport offense in Count Four is directly tied to the defendant's attempt to flee the country while on pre-

---

[8] On March 6, 2023, counsel for Padilla advised the government, "I am exploring the use of an expert at the detention hearing as to the impact of medications on Padilla's state of mind.   I will notify you as soon as possible if this becomes a reality."   The government requested that if Padilla sought to introduce expert testimony at a detention hearing, that his counsel produce an expert report and notice at least one week before the hearing.   On or about May 4, 2023, less than one week before the hearing, counsel produced a two-paragraph "summary" of an expert report, but as of the filing of this brief, the government has received neither the expert report nor any of the materials relied upon.

trial release, and the evidence against him summarized herein speaks for itself.   *See* 18 U.S.C. § 3142(g)(3)(B) (providing that the Court must consider "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal").   As to the conspiracy and securities fraud counts in Counts One through Three, those charges demonstrate that the defendant has experience using financial accounts in the names of others and in foreign jurisdictions.   *See* Dkt. 38 at ¶¶ 5–14, 26–28, 30.   The weight of the government's evidence on those counts too is strong, involving among other things, several cooperating witnesses and numerous consensually-recorded communications (and the defendant's consciousness of guilt in fleeing).

As to the potential penalties, it is noteworthy that Padilla attempted to flee the country while facing charges relating to a $7 million pump-and-dump scheme in the complaint, which yielded a Guidelines Sentencing Range with an 87-month floor.   *See* Dkt. 26 at 10; *see also* Dkt. 38 at ¶¶ 37–41, 52–53   Now, including an additional $150 million pump-and-dump scheme charged in the indictment (*see id.* at ¶¶ 31–36, 50–51), and the defendant's obstruction of justice based on flight, his Guidelines Sentencing Range has tripled:

| Guideline Description | Guideline Citation | Level |
|---|---|---|
| Base Offense Level | USSG § 2B1.1 | 7 |
| Loss Amount | USSG § 2B1.1(b)(1)(N) | +26 |
| Sophisticated Means & Outside the United States | USSG § 2B1.1(b)(10) | +2 |
| 10-plus Victims | USSG § 2B1.1(b)(2)(A) | +2 |
| Obstruction of Justice (Flight) | USSG § 3C1.1 | +2 |
| **Total Offense Level** | | **39** |
| **Guidelines Sentencing Range** | **262–327 months** | |

In other words, now in his mid-fifties, the defendant faces the possibility of spending most of the rest of his life in prison if he is convicted at trial—even if he receives a below-Guidelines sentence after trial—as well as tens of millions of dollars in restitution, forfeiture, and fines.  *See United States v. Castiello*, 878 F.2d 554, 556 (1st Cir. 1989) (significant "potential sentence" provided "strong inducement to flight"); *United States v. Mateo Soto*, No. 16-10350-RGS, 2017 WL 5178781, at *2 (D. Mass. Nov. 8, 2017) (ordering detention despite the defendant's "family and business ties in Massachusetts" due to potential "substantial jail sentence").   And, as it was earlier when he was being recorded by CW-1, the government's investigation into other stock symbols, individuals, and victims is ongoing.

In sum, against the backdrop of a presumption of detention, the Section 3142(g) factors weigh strongly in favor of detention.[9]

---

[9] Obstruction of justice is a concern as well: the defendant deleted thousands of emails shortly after his release in early September.   *See* Dkt. 26 at 9.

30

V.      **CONCLUSION**

There is a statutory presumption that the defendant should be detained, and with good reason.  While on stringent pre-trial conditions, the defendant initiated a prolonged, deliberate effort to acquire a fake Ukrainian passport to flee prosecution, and in doing so, he committed another federal crime, for which he now is also indicted.   The government is aware of no case in this District where a defendant who attempted to abscond from pre-trial release was not detained. The defendant's pre-trial release should be revoked, and he should be ordered detained pending trial under 18 U.S.C. § 3148.

Respectfully Submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ Ian J. Stearns*
JAMES R. DRABICK
IAN J. STEARNS
Assistant United States Attorneys

Dated:   May 8, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2023, the foregoing document was filed electronically with the Clerk of the Court using the ECF system, for uploading and service by electronic notice to counsel and parties authorized to receive electronically Notices of Electronic Filing.

By: */s/ Ian J. Stearns*
JAMES R. DRABICK
IAN J. STEARNS
Assistant United States Attorneys