UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>)<br>v.            )<br>)<br>JOSEPH A. PADILLA,       )<br>        Defendant | Criminal No. 23-cr-10075-RGS |

**Post-Hearing Memorandum In Support of**
**Pretrial Release Pending October 2023 Trial**

    The Defendant, Joseph Padilla, by and through undersigned counsel, hereby files his post-hearing memorandum in support of continued pretrial release. In short, now that Mr. Padilla has control of, and treatment plan for, the psychological impairments that so clearly, and indisputably, impacted his state of mind in December 2022 and January 2023, and he now possesses a "lucid" and "linear" state of mind, the defense respectfully submits that conditions of release do exist that would address any risk of flight. Indeed, before the psychological decompensation pushed Mr. Padilla to the brink of a psychotic break, he was faithfully complying with all conditions of release. Additionally, pretrial release will allow Mr. Padilla to fully and meaningfully prepare for trial, presently scheduled for October 2023. In a case where the government has argued he faces the prospect of spending "most of the rest of his life" in prison, the burdens and restrictions that continued incarceration impose upon his ability to prepare for trial is fundamentally unfair, particularly where conditions exist that will mollify any flight concerns. As such, for all of the reasons detailed below, as well as those to be advanced to the Court during the scheduled hearing, Mr. Padilla respectfully requests an order permitting continued pretrial release.

1

**I.**     ***The government has misstated the law and obfuscated facts in several respects.***

As noted in his initial memorandum, the pressure and fear generated by a federal prosecution can be overwhelming.  Here, that pressure and fear literally drove a first-time, non-violent offender to his psychological breaking point.  The power that comes with the authority to prosecute should, therefore, be wielded carefully, and without excess.  Unfortunately, that is not the case here, as the government has misstated the law and obfuscated relevant facts in several respects.

First, in their *ex parte* emergency motion to revoke release, citing *United States v. Zu Quan Zhu*, 215 F.R.D. 21, 26 (D. Mass. 2003), the government told the Court that "if a defendant is arrested in a district *other than* the district in which the arrest warrant was issued, a magistrate judge in the district of arrest has no authority to hold a revocation hearing or to release the defendant …." Government's Emergency Motion For Revocation Of Release And For Arrest Warrant Pursuant to 18 U.S.C. §3148(b) ("Govt. Motion To Revoke," herein), at 4, fn.2 (emphasis in original).  That is wrong.  As explained in *United States v. Fellows*, 2021 WL 3025741 (N.D.N.Y 2021), Magistrate Judge Collings' decision in *Zu Quan Zhu* was issued before Rule 40 was amended.  While initially there was "uncertainty" as to whether a Court possessed discretion to hold a bail hearing for an individual arrested in another district, Rule 40 "was specifically amended to correct the perception that a magistrate judge in an arresting district was not authorized to hold a detention hearing and, if appropriate, to set conditions of release." *Fellows*, 2021 WL 3025741 at *3; *see also United States v. Garraway*, 2022 WL 14752697 (S.D.Tex.2022); *United States v. Martin*, 2022 WL 4370447 (N.D.Tex.2022); *United States v. Thomas*, 2023 WL 2523502 (E.D.Mich.2023); *United States v. Turner*, 2023 WL

2401581 (W.D.N.C.2023).[1]  If accepted, though, the government's incorrect admonition to the Court, advanced in an *ex parte* pleading, would *guarantee* Mr. Padilla being shackled and transported across the country in the custody of the federal government.

Second, in its recently filed supplemental memorandum to the Court (Dkt. 73), the government argues that the "rebuttable presumption" of 18 U.S.C. §3148 controls here if the Court finds probable cause Mr. Padilla committed a new offense while on release.  *See, e.g.*, Govt. Supplemental Memorandum at 20 ("Importantly, there is a statutory rebuttable presumption of detention if the Court finds probable cause to believe the defendant committed a crime while on pre-trial release").  While §3148 obviously contains a rebuttable presumption, it is largely inapplicable in the context of this particular case.  The rebuttable presumption in §3148 applies *only* to the issue of potential danger to the community.  *See* 18 U.S.C. §3148(b) ("If there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions *will assure that the person will not pose a danger to the safety of any other person or the community*.") (emphasis added).  The government has moved to detain here on risk of flight, not danger to the community.  *See, e.g.*, Govt. Motion To Revoke at 11 ("The government further submits that no condition or combination of conditions will reasonably assure that Padilla will not flee"); *id*. at 7 and 8 (same).  Nonetheless, the government affirmatively argues the rebuttable presumption in its supplemental memorandum, conflating the issues of risk of flight and danger to the community.  *See* Govt. Supplemental Memorandum at 21 ("Applying this statutory presumption, courts in this district have frequently ordered defendants detained . . ."); *id*. at 30 ("In sum,

---

[1] To be clear, there is no reason to believe government counsel intentionally misstated the law here.

3

against the backdrop of a presumption of detention, the Section 3142(g) factors weigh strongly in favor of detention").

The government clearly knows the difference here. In its supplemental pleading, the government cites *United States v. Gennaco*, 834 F. Supp. 2d 38, 42–43 (D. Mass. 2011) and provides the following parenthetical: "First, the superseding indictment gave rise to probable cause that the defendant had committed a crime while on pre-trial release, which supports the rebuttable presumption[.]" Govt. Supplemental Memorandum at 23. Government counsel prematurely ended the Court's discussion of the rebuttable presumption in *Gennaco*—the full quote is as follows: "First, the superseding indictment gave rise to probable cause that the defendant had committed a crime while on pre-trial release, which supports the rebuttable presumption *that no conditions can assure he will not pose a danger to safety.*" *Gennaco*, 834 F. Supp. 2d at 42 (emphasis added). Closing the circle, in the government's original motion to revoke, authored by a different prosecutor, the government properly connects the rebuttable presumption to the issue of danger to the community. Govt. Motion To Rev. at 4.

Third, the government writes in its supplemental memorandum that "the evidence is also more than sufficient to establish by clear and convincing evidence that the defendant violated his conditions of release, which required him to, among other things, surrender his passport and not <u>attempt</u> to obtain a new one." Govt. Supplemental Memorandum at 24, fn. 6 (emphasis added). That too is inaccurate. The condition of release is: "surrender any valid passport to the Pretrial Services Office and not obtain a passport"—it does not address "attempts."

Fourth, and finally, the government informs the Court of its guideline calculation, in an effort to overwhelm the Court (and Mr. Padilla) with the potential sentence, going so far as to argue that Mr. Padilla "faces the possibility of spending most of the rest of his life in prison if he

is convicted at trial." Govt. Supplemental Memorandum at 30. The government omits the fact that months ago, after investigating the facts alleged in the current indictment, it was prepared to resolve this case with a cap of 6 years incarceration (which was declined by Mr. Padilla). Moreover, while the defense obviously understands the Guidelines are relevant to sentencing, the government argument "wars" with the fact that many Courts, in increasing numbers, are rejecting the loss guidelines as untethered, "absurd," and lacking empirical support. *See, e.g.*, *United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012) (the loss table "wars with common sense"); *United States v. Adelson*, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006), *aff'd* 301 Fed.Appx. 93 (2d Cir. 2008) (where "the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences"); *id*. at 512 (noting "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); *Gupta*, 904 F.Supp.2d at 351 ("Here, as there, the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology— thus maximizing the risk of injustice").[2]

---

[2] *See also* Kate Stith, *Federal Sentencing: The One–Way Ratchet*, New York City Bar Association First Annual Conference on White Collar Crime (May 2012) (discussing a typical securities fraud defendant who caused a loss of more than $12.5 million in the value of shares—that defendant would have faced a guidelines of 30-37 months in 1987, but the same defendant would face a Guidelines sentence of 151–188 months at the time of the study, a more than 500% increase); *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (highly critical of loss table as reliable proxy for culpability, noting that "[a]s far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime," observing that "[g]iven the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less solely responsible for a white-collar offender's Guidelines sentence") (emphasis in original); *United States v. Corsey*, 723 F.3d 366, 379-80 (2d. Cir. 2013); *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016);

**II.**     ***Whatever conclusions the Court draws regarding Mr. Padilla's alleged actions in December 2022 and January 2023, the evidence indisputably demonstrates that Mr. Padilla was suffering from a severe psychological decompensation during that period—to such an extreme that he was on the brink of a psychotic break***.

The Court has received a report from Dr. Jhilam Biswas ("Dr. Biswas," herein), who was hired to consult with the defense in the aftermath of Mr. Padilla's hospitalization while incarcerated in San Diego, California.[3] Dr. Biswas is a renowned forensic psychiatrist, with an impeccable pedigree, as detailed in the Curriculum Vitae provided to the Court. Her expertise is not subject to reasonable debate, nor are her clinical opinions regarding Mr. Padilla's psychological impairments during the relevant time frame. Indeed, the government has not seriously challenged those conclusions, and the Court, without objection from the government, appropriately designated Dr. Biswas an expert witness. Transcript at 31. And, according to Dr. Biswas' expert opinion, during the relevant time frame, Mr. Padilla suffered from serious psychological issues that undoubtedly influenced his perception of reality and decision-making.

First, according to Dr. Biswas, the trauma inflicted by the very public, and humiliating, arrest at the San Diego Airport, and the following nine days in solitary confinement, caused Mr. Padilla to suffer from "an adjustment disorder with mixed depression and anxiety…." Transcript at 11. Dr. Biswas explained that "solitary confinement in particular can exacerbate mental health symptoms in individuals who have no history of any kind of psychiatric disease." Transcript at 26. She further explained that solitary confinement can have that impact on "the healthiest person, but, in particular, individuals who have a childhood trauma of experiencing incarceration

---

*United States v. Herink*, 2012 WL 3112002 (D.Neb. July 30, 2012) (unreported); *United States v. Parris*, 573 F.Supp.2d 744, 745 (E.D.N.Y. 2008).

[3] The government seemingly tried to insinuate through questioning that the defense hired a psychiatric expert only after Mr. Padilla told Ms. Robinson, during a jail-recorded call, that he was skeptical of being released in this case. *See* Transcript at 60-61; Govt. Supp. Memo at 19. The defense began its efforts to consult with a psychiatric expert in this matter soon after Mr. Padilla's hospitalization in January 2023, and well before the conversation cited by the government. To the extent the Court views this as an issue, the defense can provide the Court with independent evidence of this fact.

6

within their family systems …." Transcript at 26. She concluded that the trauma of the arrest and solitary confinement "certainly" led to Mr. Padilla's "almost constant state of tremulousness, shakiness, feeling like everybody was out to get him once he was post-release …." Transcript at 26. Dr. Biswas further testified that an "[a]djustment disorder post-incarceration [is] common," that she has seen it "hundreds of times," including during her work at the Bridgewater State Hospital, and that it has also been "described as post-incarceration syndrome as well." Transcript at 25.

     Dr. Biswas also testified that Mr. Padilla's traumatic childhood "certainly amplified" his psychological reaction to his arrest and prosecution, particularly where he had never before dealt with that trauma in a meaningful, professional manner. Transcript at 24. As noted in Dr. Biswas' report, Mr. Padilla's childhood was punctuated by violence and police raids due to his father's criminal activities. *See* Dr. Biswas' Report (Exhibit 1) at pp. 3, 5. As Dr. Biswas testified, Mr. Padilla "spent most of his life trying to get away from that past, to build up his life, to go to college, to be the first generation in his family to be going to college and then kind of leading that life and leading a better life …." Transcript at 23. In Dr. Biswas' opinion, "prison and his father, and his father's constant behaviors that he never wanted to associate himself with, I think were largely brought back into his life in August [on Mr. Padilla's own arrest] …." Transcript at 23. As explained by Dr. Biswas, Mr. Padilla "has this long history of a father that he does not want to associate himself with, who was in and out of incarceration, who was very violent and was around violent people when he was a child, and that's not what he wanted to associate himself with . . .." Transcript at 23. Dr. Biswas testified that the arrest and solitary confinement in this case "might have caused this adjustment disorder more acutely in Mr. Padilla than maybe the average person because he has this history of childhood trauma where there were

7

police raids at his house, and his father was incarcerated multiple times, and that was everything he didn't want to be, and he avoided it for his entire life until this moment happens in the San Diego Airport on August 25th and then the following solitary confinement . . ..'' Transcript at 23-24.  In the end, Dr. Biswas testified, "never kind of processing that trauma in early life along with his legal issues I think certainly heightened this adjustment disorder with depressed mood and anxiety."  Transcript at 25.  Importantly, Dr. Biswas explained that Mr. Padilla likely had "been able to compartmentalize his childhood and life for a long period of time in his life . . ., but [ ] the incarceration certainly brought all of that back, and he really didn't have any supports to deal with it once he was released."  Transcript at 26.

Dr. Biswas explained how Mr. Padilla "became increasingly paranoid" in the months after his arrest, with Ms. Robinson describing him as "acting erratic and oddly over that period of time . . .  he was constantly shaking uncontrollably, he was always tremulous, he was never sleeping at the right times . . ..''  Transcript at 12.  Mr. Padilla "was starting to believe that everything and everyone was watching him, any car parked outside was watching him . . . he thought people . . . in the cashier line were secret agents.  He was believing that the TVs were monitoring him, the phones were monitoring him."  Transcript at 13.  Dr. Biswas testified that Mr. Padilla described that "he felt strange, felt kind of like it was an out of body experience over time, it felt almost like he was in a dream-like state and it felt very stressful."  Transcript at 13.  Unsurprisingly, Mr. Padilla attempted "to self-medicate with alcohol to deal with his anxiety, as well as Xanax…"  Transcript at 11.

The descriptions of Mr. Padilla and Ms. Robinson are fully corroborated by Mr. Padilla's self-initiated visits to his primary care physician, first in November 2022, and then again in December 2022.  Transcript at 14.  Mr. Padilla complained of "[c]onstant panic attacks, anxiety,

8

insomnia, low mood." Transcript at 14; *id*. at 11 ("constant panic attacks, depression, insomnia, and paranoid thoughts"). On November 17th, the primary care physician prescribed 50 milligrams of "Sertraline, an anti-depressant medication, and Ativan, a medication to treat acute anxiety." Transcript at 14. Unfortunately, Mr. Padilla's primary care physician likely prescribed the incorrect medication. As Dr. Biswas explained, "[i]n a small subset of individuals who might have a predisposition to bipolar disorder or have a family history of bipolar disorder, genetically, their depression looks different, and sometimes, and largely in this population, SSRI medications are not helpful, so rather than finding relief for their depression, what they might experience is more kind of numbness, not caring, apathy, feelings of just not feeling like you're in your body and living your reality, kind of feeling a little bit out of it and not feeling your emotions in the same way." Transcript at 15.

Compounding the error, when Mr. Padilla returned to his primary care physician in December 2022, the doctor increased the Sertraline (Zoloft) prescription to 100 milligrams. Transcript at 16. On top of this, Mr. Padilla continued "self-medicating with 10 to 15 drinks a day." Transcript at 16. "He was also taking Xanax, which is like a Benzodiazapine, but has serious side effects when you come off of it very quickly or if you take it over a long period of time or if you overuse it." Transcript at 16. Dr. Biswas offered than when you take Xanax, Ativan and alcohol, the "three of those substances together can be very detrimental over time. It provides some short-term relief for anxiety but can certainly cause serious side effects over time, and they amplify each other's effects as well." Transcript at 17.

As Dr. Biswas explained, it was during this critical time-period, leading up to his arrest in January 2023, that Mr. Padilla was experiencing a significant psychiatric decompensation. In her words:

9

> … slowly this adjustment disorder, which was kind of treated in a subthreshold manner, it was attempted to be treated by his primary care doctor, by the self-medication, however, it wasn't being treated, and the substance abuse concomitantly with the mental disorder together was causing a psychiatric decompensation which both Mr. Padilla and his partner describe as becoming increasingly paranoid, tremulous, shaking, not sleeping, low mood, feeling like a sense of doom that life is over, these types of feelings, and at times passive suicidal feelings, so this is what I describe overarchingly as the psychiatric decompensation.

Transcript at 17. As Dr. Biswas explained, Mr. Padilla "was heading towards a psychotic event, but he wasn't quite there yet." Transcript at 17-18.

It was after his arrest in January 2023 when Mr. Padilla suffered a full psychotic break, as documented by the observations of the doctors at the Paradise Valley Hospital and the results of various labs taken in concert with that hospitalization. Importantly, though, as Dr. Biswas explained, "you don't just go into a psychotic episode from nothing . . . it's a process, it takes time, it takes the erosion and the decompensation of mental health over time . . .." Transcript at 18. In other words, Mr. Padilla was seriously decompensating in December 2022 and January 2023. *See, e.g.*, Transcript at 18 ("we'll see psychotic episodes in people who suffer from depression or bipolar disorder or schizophrenia. People, you know, popularly know schizophrenia to be the diagnosis that causes psychosis, but we certainly call major depression with psychotic features and bipolar disorder with psychotic features, we certainly see psychotic features in other disease processes, and that tends to occur when that person has suffered over time untreated and with superimposed substance use on top of that"). And, Dr. Biswas confirmed that the psychiatric decompensation that Mr. Padilla was experiencing, leading to the psychotic break in January 2023, would have "absolutely" impacted his perception of reality:

> What I can say is generally people who are experiencing a psychiatric decompensation with depression, I mean, the depression itself comes from this feeling of hopelessness, helplessness, despair, and where does that come from, that comes from the way you're looking at the world around you and your opportunities and what your future looks like.

10

> So depression in general can cause severe vulnerability towards having a sense of a foreshortened future and life, if that answers your question.

Transcript at 19.

As to the actual psychotic break, when asked to explain it in "layman's terms," Dr. Biswas testified that a psychotic break "is basically a break from reality where you're getting stimuli from your environment that you're completely interpreting in a disorganized manner, most often in the belief that everybody is after you, and it tends to be persecutory most often ...."

Transcript at 22. Dr. Biswas testified as follows:

> So according to the records from Paradise Valley Hospital, he was in the midst of an acute psychotic break where he was floridly psychotic, so they evaluated him as his mindset was completely disorganized, his thought process was scattered, his thoughts were held together loosely. We call that loose, that's what the note says, loose, scattered, disorganized. He was dehydrated. He had acute renal failure, which means that he must have not been eating or drinking at all in the jail. He came in, he was chattering, he was laughing inappropriately to himself, he was responding to hallucinations. While Mr. Padilla said he wasn't having hallucinations, the doctor wrote down he likely was because he was responding to them. Also, on top of that, they did a full physical exam and they listened to his heart and lungs, and he was breathing very shallow and coarsely, indicating likely dehydration and also panic, you know, being in a panicked and anxiety-provoken state.

Transcript at 20-21. Dr. Biswas also highlighted comments in the hospital records noting that Mr. Padilla was "fighting back the correctional officers," he had "bilateral cuts to his wrists, he had abrasions and scrapes, and he was not able to articulate any of his background or his history, and so the doctor there diagnosed him as schizophrenic…." Transcript at 21. Dr. Biswas explained that schizophrenia can be a common misdiagnosis "if the doctor has no other information going into the evaluation and sees someone who is floridly psychotic and in their 50's, they may conclude that this person has chronic schizophrenia over time." Transcript at 21. Dr. Biswas, though, will a fuller understanding of relevant events, and extensive expertise in this specific area, concluded that "Mr. Padilla suffered an adjustment disorder with depressed mood

11

and anxiety that then continued not fully treated into a psychiatric decompensation that eventually by the time he was arrested, and that was a superimposed acute stressor on top of his mental health condition, he then fell into full psychotic episode." Transcript at 21-22. Dr. Biswas also noted that while she diagnosed Mr. Padilla with "substance-induced psychotic disorder, [ ] it could have also been just a psychotic disorder." Transcript at 22.

Importantly, Dr. Biswas explained the impact of Mr. Padilla's psychological issues on his decision-making, explaining:

> … in general in somebody who experiences a clear and documented psychotic event five days after arrest is that it was certainly percolating, that decompensation and deterioration of mood, thought process, ability to think, I mean he wasn't sleeping at all, he wasn't sleeping at all in the jail setting either, but even before that, he was drinking a lot of alcohol and taking Xanax in order to sleep. It seems that you can't get to that period of being so floridly psychotic that the doctor who sees you thinks you have long-term chronic schizophrenia. It's hard to get to that point from a very healthy state, and so my sense is there was clearly a psychotic decompensation that he was trying to treat with his own substances but also trying to go to the doctor and then on top of that getting an anti-depressant medication that wasn't quite tailored to his type of depression and mood disorder . . ..

Transcript at 26-27. Dr. Biswas testified that, "because of that, when you feel apathy and uncaring and numbness from medications, you tend to not care how much you're drinking, you tend to not care what's going on around you, *you tend to do things to extreme in a way you wouldn't if you weren't having kind of feelings of apathy and numbness*." Transcript at 27 (emphasis added).

Finally, in terms of his current state of mind, Dr. Biswas explained that, during her interactions with him, Mr. Padilla was "thoughtful, cooperative, linear, logical, able to remember his entire history and able to say how distinctly different that period was for him, particularly in January and that incarceration at the very beginning of this year." Transcript at 28. If released, Dr. Biswas offered that Mr. Padilla should undergo psychotherapy with a therapist at a "regular

interval" and, if medicated, to ensure use of a proper anti-depressant that will not exacerbate his conditions. Transcript at 28.[4]

**III.** ***Now that Mr. Padilla is in control of his faculties, and possesses a "thoughtful," "linear," and "logical" state of mind, there are conditions of release that will adequately address any risk of flight.***

The defense recognizes the Court possesses the discretion to revoke pretrial release in this matter. The defense respectfully urges the Court to consider a different option, though—one that recognizes Mr. Padilla was not of sound mind in December 2022 or January 2023, and one that appropriately considers the fact that Mr. Padilla was psychologically decompensating due to (a) the pressure of the pending criminal prosecution, (b) the promise of a forthcoming indictment containing grandiose allegations of a $150 million dollar fraud scheme, (c) the threat of a parallel civil action by the SEC, and (d) the fact he was likely receiving the wrong medicine (Sertraline).

After his release in early September 2022, Mr. Padilla was fully compliant with his conditions of release. The government alleges that in December 2022, four months after his release, he began an attempt to secure a foreign passport. As Dr. Biswas explained, by that point in time, Mr. Padilla was psychologically decompensating. He had already visited with his primary care physician, complaining of "[c]onstant panic attacks, anxiety, insomnia, low mood." Transcript at 14; *id*. at 11 ("constant panic attacks, depression, insomnia, and paranoid thoughts"). He had been prescribed 50 milligrams of Sertraline and was self-medicating with copious amounts of alcohol and Xanax. Transcript at 16. Clearly, by December 2022, the trauma inflicted by his arrest, the pressure brought from the federal prosecution, and the threat of a future indictment and a parallel SEC action overwhelmed his psychological faculties. Simply

---

[4] As Dr. Biswas explained, she believes the Sertraline was likely wrongly diagnosed given her suspicion that Mr. Padilla may have a previously undiagnosed bipolar disorder, which would have caused "feelings of numbness, apathy, no resolving of the depression symptoms, feeling better but not really feeling like you're within your body." Transcript at 29.

13

put, as Dr. Biswas' testimony indicates, Mr. Padilla became psychologically incapable of dealing with the pressure of these stressors.

Succumbing to the overwhelming pressure occasioned by a federal prosecution is certainly not unique to Mr. Padilla. It is enough to push even the healthiest, strongest human to make irrational, unhealthy decisions, including innocent people pleading guilty to non-existent crimes. *See, e.g*., The New York Review of Books, *Why Innocent People Plead Guilty*, Jed S. Rakoff, November 20, 2014, (noting, *inter alia*, that the "criminal justice system in the United States today bears little relationship to what the Founding Fathers contemplated. . ." and that, today, the federal sentencing "guidelines, like the mandatory minimums, provide prosecutors with weapons to bludgeon defendants into effectively coerced plea bargains"); The Vast Majority of Criminal Cases End In Plea Bargains, A New Report Finds, https://www.npr.org/2023/02/22/1158356619/plea-bargains-criminal-cases-justice, February 22, 2023 (noting, *inter alia*, that a "task force that includes prosecutors, judges, defense attorneys and academics cited 'substantial evidence' that innocent people are coerced into guilty pleas because of the power prosecutors hold over them, including the prospect of decades-long mandatory minimum sentences"); "Why Do Innocent People Plead Guilty," February 26, 2019, https://www.uml.edu/news/press-releases/2019/wilfordresearch022619.aspx (detailing National Science Foundation grant awarded to a Professor at University of Massachusetts at Lowell to study why defendants plead guilty, including those innocent of the charged crimes). Indeed, in the recent prosecution of four Boston Police Officers, all of whom were acquitted only hours into jury deliberations, multiple cooperating police officers—with decades of collective experience in the criminal justice system—conceded on cross-examination they pleaded guilty to crimes they did not believe they committed. *See United States v. Torigian, et al*., Case No. 21-10164-NMG.

That is just a microcosm of a much larger problem, as reflected in a recent story on the First Circuit reversing the government's Varsity Blues convictions, wherein several lawyers commented on the excruciating pressure brought to bear by a federal prosecution, to explain how numerous individuals likely pleaded guilty to non-existent federal crimes. *See* Law360, "DOJ Faces Uphill Battle After Nixed 'Varsity Blues' Convictions, May 11, 2023 (one commentator noting "[i]t's sad that 47 others pleaded guilty to something that's not even a crime . . . But that's our criminal justice system — it allows prosecutors to bully defendants into pleading guilty because of the enormous risks of proceeding to trial, even on outlandish and untested theories of fraud"). In short, the pressure, anxiety and fear brought by a federal prosecution is real—it can push even strong, healthy individuals to make irrational and unhealthy decisions.

As Dr. Biswas testified, though, Mr. Padilla was anything but healthy in December 2022 and January 2023, when the government alleges he attempted to obtain a fake passport.[5] Mr. Padilla was crumbling under the pressure of the instant prosecution, and the threats of future criminal and civil proceedings. Indeed, while there is room to debate whether or not Mr. Padilla *actually* intended to flee or to ultimately acquire the passport,[6] there is <u>no</u> principled basis to dispute that Mr. Padilla was not of sound mind during that critical time period. As Dr. Biswas testified, in December 2022 and January 2023, Mr. Padilla was psychologically decompensating and on the brink of a true psychotic break. He was depressed, hopeless, and had a sense of a foreshortened future and life. Transcript at 19. "[B]ecause of that, when you feel apathy and uncaring and numbness from medications, . . . you tend to not care what's going on around you, *you tend to do things to extreme in a way you wouldn't if you weren't having kind of feelings of*

---

[5] Mr. Padilla did not attempt to flee, as the government repeatedly suggested during its questioning of Dr. Biswas. *See* Transcript at 37, 38, 46.
[6] The government chose to arrest Mr. Padilla in the wake of the January 20, 2023, call, before any decisive action could be taken by Mr. Padilla, one way or the other.

15

*apathy and numbness*." Transcript at 27 (emphasis added).  In addition to her impeccable credentials and unimpeached testimony, Dr. Biswas' conclusions are independently corroborated by Mr. Padilla's self-initiated visits to his primary care physician in November and December 2022, Ms. Robinson's independent observations of Mr. Padilla, and the medical records from the Paradise Valley Hospital.

As such, the issue here boils down to whether conditions exist that will reasonably assure Mr. Padilla's appearance in Court as required.  The defense respectfully submits that such conditions do exist.  First, Dr. Biswas testified that Mr. Padilla is now psychologically stable and lucid.  This clinical opinion significantly undercuts the government argument that no conditions of release exist to assure Mr. Padilla's appearance in Court as required.  If psychologically stable, with a clear mind, Mr. Padilla can abide by Court imposed conditions of release, as he clearly demonstrated after his original release in September 2022.  Continued treatment, as recommended by Dr. Biswas, will guard against any future psychiatric decompensation.  Second, while Mr. Padilla would prefer to reside in San Diego where his family support structure exists, Mr. Padilla is willing to rent an apartment in the Seaport area, in close proximity to the Courthouse, to facilitate close supervision by Pretrial Services.  Mr. Padilla could report to Pretrial, in person, on a daily basis, if needed.  Third, the conditions of home detention with electronic monitoring will adequately address any remaining concerns regarding flight.  Indeed, if Mr. Padilla resides in Boston, any government concerns regarding Mr. Padilla being in close proximity to the Mexican border would be obviated.  Fourth, Mr. Padilla is willing to abide by any other conditions of release the Court believes necessary to secure his release.

Finally, the defense respectfully notes that pretrial release would obviate any Sixth Amendment issues generated by Mr. Padilla's continued detention.  The defense has requested a

speedy trial in this matter, which is scheduled for October 23, 2023.  The government has produced a mountain of material, and the defense expects even more productions.  Restrictions imposed by the Wyatt Detention Center, however, will prevent Mr. Padilla from fully reviewing these materials in advance of the October trial date.  At the present time, Mr. Padilla's review of discovery is limited to one day per week, for a maximum of three hours on that day.  Even if counsel provides a laptop to the Wyatt facility pre-loaded with discovery materials (the present plan), Mr. Padilla will, at most, be afforded the opportunity to review discovery three days a week, from 9 a.m. to 5 p.m.—and that is if everything goes perfectly at the jail, which is not likely.  Twenty-four hours per week is not sufficient to review the universe of discovery materials in this case and/or to properly prepare for a trial in this matter.

      The limitations imposed upon Mr. Padilla's review of materials by continued pretrial detention raises serious Sixth Amendment concerns.  Mr. Padilla is mindful this issue is not unique to his case, but it nonetheless is a serious issue.  As one court has observed, "[i]ntrinsic in an accused's right to the effective assistance of counsel is the right to assist in the preparation of his own defense."  *Copeland v. Mercer Cnty. Correction Ctr.*, No. CV175780MASLHG, 2019 WL 3453273, at *5 (D.N.J. July 30, 2019), *citing Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978) ("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev 'd on other grounds sub nom., Bell v. Wolfish*, 441 U.S. 520 (1979); *De La Rosa v. United States*, Civ. No. 94-7623, 1995 WL 251302, at *1 (E.D. Pa. Apr. 25, 1995).  "Pretrial detention conditions may violate the Sixth Amendment when 'they unreasonably burden[ ] the inmate's opportunity to consult with his attorney and to prepare his defense,' *Benjamin v. Fraser,* 264 F.3d 175, 187 (2d Cir.2001) (evaluating constitutionality of restrictions placed on attorneys visiting clients at Rikers Island), or when they result in the

'actual or constructive denial of the assistance of counsel altogether.' *United States v. Lucas,* 873 F.2d 1279, 1280 (9th Cir.1989) (quoting *Perry v. Leeke,* 488 U.S. 272, 280 (1989))." *United States v. Allick*, No. CRIM.A. 2011-020, 2012 WL 32630, at *2 (D.V.I. Jan. 5, 2012). Mr. Padilla is not asserting at this time that a Sixth Amendment violation has occurred, but he does respectfully submit that pretrial release will avoid any such issues in the future. It will also provide Mr. Padilla with a fundamentally fair process, ensuring that he is fully capable of preparing for trial in this matter. According to the government, Mr. Padilla is facing the prospect of spending "most of the rest of his life in prison" if convicted in this case. Govt. Supplemental Memorandum at 30. It would be fundamentally unfair to significantly handicap Mr. Padilla's ability to defend himself in such a case when there are suitable conditions of release that will mollify any flight concerns. As one commentator has noted, incarceration before trial "substantially impacts the quality of the[] defense" and "increase[s] the likelihood that the detainee will be convicted, imprisoned, and subjected to prolonged deprivation of liberty, privacy, and other fundamental elements of human existence." Samuel R. Wiseman, *"Pretrial Detention and the Right to be Monitored,"* 123 YALE L. J. 1344 (2014).

**IV.    *Conclusion*.**

For all of the foregoing reasons, as well as those to be advanced at the scheduled hearing, Mr. Padilla respectfully requests an order allowing pretrial release in this matter, subject to any and all conditions the Court believes necessary to adequately address any risk of flight, including but not limited to (a) home detention, (b) electronic monitoring, and (3) appropriate mental health treatment, as recommended by Dr. Biswas.

                                              Respectfully Submitted,
                                              The Defendant,
                                              Joseph A. Padilla,
                                              By His Attorney,

                                              **/s/ Robert M. Goldstein**
                                              Robert M. Goldstein, Esq.
                                              Mass. Bar No. 630584
                                              20 Park Plaza, Suite 1000
                                              Boston, MA 02116
                                              (617) 742-9015
                                              rmg@goldstein-lawfirm.com

Dated:  May 25, 2023


## Certificate of Service

    I, Robert M. Goldstein, hereby certify that on this date, May 25, 2023, a copy of the foregoing document has been served via the Electronic Court Filing system on all registered participants, including Assistant U.S. Attorneys James R. Drabick and Ian Stearns.


                                              **/s/ Robert M. Goldstein**
                                              Robert M. Goldstein